# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-40772

United States Court of Appeals
Fifth Circuit

**FILED**
September 18, 2018

Lyle W. Cayce
Clerk

GEORGE ALVAREZ,

       Plaintiff-Appellee,

v.

THE CITY OF BROWNSVILLE,

       Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and JOLLY, JONES, SMITH, WIENER, DENNIS, CLEMENT, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, COSTA, WILLETT, and HO, Circuit Judges.*

CARL E. STEWART, Chief Judge, joined by JOLLY, JONES, SMITH, WIENER, CLEMENT, OWEN, ELROD, SOUTHWICK, HAYNES, HIGGINSON, WILLETT, and HO, Circuit Judges:**

---

    * Judge Prado was on the court at the time that this en banc case was submitted and argued but did not participate in the consideration of the decision. Judge Duncan, Judge Engelhardt and Judge Oldham joined the court after this case was submitted and did not participate in the decision.

    ** Judge Haynes and Judge Willett concur in Sections I, II.A., and III., and they would not reach the issue in Section II.B.

No. 16-40772

This case was reheard en banc after the Appellee, George Alvarez, had his $2.3 million judgment reversed and his claims against the City of Brownsville dismissed by a panel of this court. The en banc court has carefully considered two important questions as to the merits of this case: (1) whether the City of Brownsville should have been subjected to municipal liability for Alvarez's claim under *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) whether Alvarez was precluded from asserting his constitutional *Brady* claim for his 42 U.S.C. § 1983 action against the City of Brownsville because he pled guilty. For the reasons set forth below, we REVERSE the district court's judgment, and RENDER judgment in favor of the City of Brownsville. Alvarez's action against the City of Brownsville is DISMISSED with prejudice.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background

*1.    The Incident Between Alvarez and Officer Arias at the Jail*

On November 27, 2005, Alvarez, a then-seventeen year old ninth grade special education student, was arrested by the Brownsville Police Department and taken to a detention center in Brownsville, Texas on suspicion of public intoxication and burglary of a motor vehicle. After being placed in one of the holding cells, Alvarez attempted to use a telephone located in the cell. Initially, Alvarez was able to place a call but the phone eventually stopped working. Alvarez then banged the phone's handset against the phone's switch hook mounted on the wall, and made an obscene gesture towards a camera. Because Alvarez became somewhat disruptive, officers removed Alvarez from his cell and attempted to transfer him to a padded cell to calm down. To move Alvarez to the padded cell, the officers had to walk him across the jail's central lobby booking area.

After reaching the booking area, Alvarez engaged in a conversation with a group of officers. Alvarez primarily spoke to Officer Jesus Arias who took the lead in trying to direct Alvarez to the padded cell. As the conversation continued, Alvarez was reluctant to move towards the padded cell and obey Officer Arias's instructions to walk towards the cell. When recalling the conversation with Officer Arias, Alvarez indicated, "I understand I wasn't compliant."

A scuffle between Alvarez and Officer Arias soon ensued. The altercation began when Officer Arias grabbed Alvarez's left arm and maneuvered Alvarez to the ground. Officer Arias then placed Alvarez in a choke hold and eventually a head lock. Officers assisting Officer Arias subdued Alvarez by shackling Alvarez's legs and handcuffing him. Throughout the struggle, Alvarez squirmed and flailed his arms. Alvarez, handcuffed and legs shackled, was then carried and placed in the padded holding cell. All of the events that took place at the jail before, during, and after Alvarez's incident with Officer Arias were captured on video.

*2.     Investigations Conducted by the Brownsville Police Department*

The Brownsville Police Department utilizes separate investigative tracks for internal disciplinary investigations of its officers and alleged crimes committed by detainees at the jail. An internal administrative investigation was conducted to determine if Officer Arias violated the Brownsville Police Department's use of force policy during the altercation with Alvarez. Additionally, a criminal investigation was conducted by the Brownsville Police Department to determine if there was probable cause for recommending that the district attorney's office criminally charge Alvarez for assaulting Officer Arias.

No. 16-40772

Generally, the Brownsville Police Department's internal administrative affairs division does not share information with the criminal investigation division. If information is to be shared between the internal administrative affairs division and the criminal investigation division, Police Chief Carlos Garcia is usually the individual who authorizes the exchange. However, Sergeant David Infante, the jail supervisor who downloaded the videos of the incident for the internal administrative investigation of Officer Arias, stated that "if something would have been asked of me by the criminal investigation, I would have submitted it." Police Chief Garcia further added that Sergeant Infante should have provided the videos of the incident to the criminal investigation division if he knew criminal charges were being brought against Alvarez. Commander Roberto Avitia, also a supervisor of Sergeant Infante, similarly stated that Sergeant Infante should have disclosed the videos to the criminal investigation division.

For the internal investigation, Sergeant Infante evaluated the videos and Officer Arias's report of the incident. Four different videos were reviewed: (1) a video of Alvarez in the initial holding cell that he was placed in; (2) a video of the officers at the central command post in the detention center before, during, and after the incident; (3) a video of the altercation between Alvarez and Officer Arias that occurred in the lobby booking area; and (4) a video of Alvarez in the padded cell after he was transported. After conducting the investigation, Sergeant Infante came to the conclusion that Officer Arias used proper force and that no further action should be taken.

Two days after the incident between Alvarez and Officer Arias, on November 29, 2005, Sergeant Infante sent a memorandum to Police Chief Garcia reiterating his recommendation that proper force was used. On December 8, 2005, another supervisor of Sergeant Infante, Commander

No. 16-40772

Ramiro Rodriguez, reviewed Sergeant Infante's report and the video recordings, and submitted a report to Police Chief Garcia recommending closure of the internal administrative investigation since Officer Arias's actions were in compliance with Brownsville Police Department regulations.

Even though the reports and recommendations were stamped as received on December 8, 2005 by Police Chief Garcia's office, Police Chief Garcia did not review the reports. The materials for the internal investigation, including the videos, were never passed on to an internal affairs unit for a formal disciplinary investigation of Officer Arias or to the criminal investigation division of the Brownsville Police Department.

The criminal investigation division reviewed the incident after the internal administrative review was conducted. The criminal investigation began on November 27, 2005, with Sergeant Jim Brown preparing and filing an offense report of the incident that occurred between Alvarez and Officer Arias. Sergeant Brown was the patrol supervisor responsible for addressing issues that arose at the jail when the incident occurred.[1] Sergeant Brown's report stated Alvarez allegedly assaulted Officer Arias but did not mention that there were any video recordings of the incident. Criminal investigator Officer Rene Carrejo was subsequently assigned to review Officer Arias's complaint that Alvarez assaulted him by grabbing his throat and his right inner thigh. Officer Carrejo never requested or inquired about the possible existence of a video recording of the incident. Lieutenant Henry Etheridge, the head of the internal affairs division of the Brownsville Police Department at

---

[1] Although Sergeant Infante was officially the jail supervisor, the supervision responsibilities of the jail passed to Sergeant Brown as one of the patrol supervisors after 5:00 p.m. Because the incident between Alvarez and Officer Arias occurred around 9:00 p.m., when Sergeant Infante was off duty, Sergeant Brown was responsible for supervising the jail at this time.

the time of the administrative review, opined that the criminal investigation division did not conduct a proper investigation because it failed to collect all evidence. Lieutenant Etheridge further noted that, "[i]f I knew that [the criminal investigation division] wasn't conducting proper investigations in regards to collecting that video, by all means, I would have taken corrective action to . . . get that video in their hands."

### 3.     *Alvarez's Guilty Plea and Imprisonment*

The criminal investigation division subsequently alerted the district attorney's office of the incident and Alvarez was charged with assault on a public servant, a felony offense in Texas. In January 2006, a grand jury returned an indictment charging Alvarez with the assault. During discovery, Alvarez's attorney reviewed the prosecution's case file that did not contain the videos of the incident. In March 2006, Alvarez pled guilty to assault on a public servant. In May 2006, Alvarez was given a suspended sentence of eight years of imprisonment and ten years of community supervision. As a condition of the community supervision, the court imposed "a term of confinement and treatment in a substance abuse felony punishment facility . . . for not less than 90 days or more than 12 months as a condition of probation." In November 2006, after Alvarez failed to complete the treatment program, the state revoked the suspension of Alvarez's sentence and remanded Alvarez to prison for the remainder of his eight-year sentence.

### 4.     *The Uncovering of the Video Recordings of the Incident*

Approximately four years after Alvarez began to serve his prison sentence, the videos of Alvarez's incident with Officer Arias surfaced during discovery for an unrelated § 1983 case. After the discovery of the videos, Alvarez filed an application for a writ of habeas corpus in Texas state court, claiming that the Brownsville Police Department had withheld the videos in

violation of *Brady*. In October 2010, after the state district court recommended that the writ of habeas corpus be granted and that Alvarez be given a new trial, the Texas Court of Criminal Appeals concluded that Alvarez was "actually innocent" of committing the assault. Alvarez's assault conviction was then set aside and all charges against Alvarez were later dismissed.

**B. Procedural History**

Several months after being declared "actually innocent," in April 2011, Alvarez sued the City of Brownsville, Officer Arias, and other individuals from the Brownsville Police Department, asserting various claims under § 1983, which included nondisclosure of exculpatory evidence in violation of *Brady*. In August 2012, the City of Brownsville, Officer Arias, and the other defendants filed a motion for summary judgment arguing that Alvarez's claims should be dismissed. Adopting the magistrate judge's report and recommendation, the district court denied the defendants' motion for summary judgment as to: (1) the *Brady* claim against the City of Brownsville for nondisclosure of exculpatory evidence; and (2) a fabrication of evidence claim brought against Officer Arias in his individual capacity. The district court granted the defendants' motion for summary judgment as to all other claims. The fabrication claim against Officer Arias was later dismissed after Alvarez and Officer Arias filed a voluntary stipulation of dismissal.

In January 2014, Alvarez and the City of Brownsville, as the only remaining parties, filed cross motions for summary judgment addressing whether: (1) a Brownsville Police Department policy of nondisclosure existed; (2) the Brownsville Police Department's failure to disclose the videos constituted a *Brady* violation; and (3) a Brownsville Police Department policy caused the *Brady* violation. The district court subsequently granted Alvarez's motion for summary judgment concluding that there was a *Brady* violation as

No. 16-40772

a matter of law, and Alvarez established "all substantive elements of a § 1983 municipal liability claim against the City of Brownsville."

The district court held a jury trial to determine whether Alvarez was entitled to monetary damages for the *Brady* violation. Following a two-day jury trial, the jury awarded Alvarez $2,000,000 in compensatory damages. The parties agreed to attorneys' fees of $300,000 and the court entered final judgment in favor of Alvarez for $2,300,000. The City of Brownsville filed post-trial motions, which were denied by the district court. The City of Brownsville timely appealed.

A panel of this court reversed the $2,300,000 judgment awarded to Alvarez and dismissed Alvarez's action against the City of Brownsville. *Alvarez v. City of Brownsville*, 860 F.3d 799, 803 (5th Cir. 2017), *reh'g en banc granted*, 874 F.3d 898 (5th Cir. 2017). The panel opinion held that by entering a guilty plea Alvarez waived the right to assert the *Brady* claim foundational to his § 1983 action. The panel opinion was withdrawn in light of en banc rehearing of this case. After supplemental briefing and oral argument to the en banc court, we reverse the district court and render judgment of dismissal in favor of the City of Brownsville.

## II.   DISCUSSION

Alvarez's *Brady* claim should have been dismissed as a matter of law on summary judgment because the City of Brownsville should not have been subjected to municipal liability for Alvarez's § 1983 claim. This court also declines the invitation to disturb its precedent concerning a defendant's constitutional right to *Brady* material prior to entering a guilty plea.

### A. Municipal Liability

Alvarez argues that the City of Brownsville, through its police department, had an unwritten, customary policy of not disclosing exculpatory

evidence obtained in the course of internal administrative investigations—a policy that caused Alvarez's constitutional violation. Alternatively, Alvarez asserts that making Police Chief Garcia the sole decision-maker related to the sharing of information from internal administrative matters created the high possibility of a constitutional violation. Because of Police Chief Garcia's oversight, Alvarez asserts that the City of Brownsville should be held liable as a municipality. This court is not persuaded by Alvarez's arguments.

Summary judgment rulings are subject to de novo review. *Aldous v. Darwin Nat'l Assurance Co.*, 851 F.3d 473, 477 (5th Cir. 2017), *vacated in part by* 889 F.3d 798 (5th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *State Farm Fire & Casualty Co. v. Flowers*, 854 F.3d 842, 844 (5th Cir. 2017) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1068, 1075 (5th Cir. 1994)).

Three essential elements must be established for a municipality to face § 1983 liability. There must be: (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). An official policy

"usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579) (quotation marks omitted).

To establish that the City of Brownsville is liable as a municipality, a policy must have been the "moving force" behind Alvarez's constitutional violation. *See Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694). Stated differently, Alvarez "must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." *See James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580). Additionally, Alvarez must demonstrate that the policy was implemented with "deliberate indifference" to the "known or obvious consequences" that constitutional violations would result. *See Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997). To base deliberate indifference on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003). The causal link "moving force" requirement and the degree of culpability "deliberate indifference" requirement must not be diluted, for "where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Brown*, 520 U.S. at 415).

Assuming that Police Chief Garcia is a policymaker and that the practice of not freely sharing information from the internal administrative investigations with the criminal investigation division constitutes a policy, Alvarez's theory of liability falls short in two respects: (1) there is not a "direct

causal link between the policy and the violation," and (2) there was no "deliberate indifference" shown. *See Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010); *James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580).

First, there is not "a direct causal link between the policy and the violation." *See James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580). When questioned about whether he could turn materials over to the criminal investigation division, Sergeant Infante stated that "if something would have been asked of me by the criminal investigation, I would have submitted it." Moreover, Police Chief Garcia and Commander Avitia both stated that Sergeant Infante should have disclosed the videos of the incident if he was aware of the criminal investigation against Alvarez. Commander Avitia further stated that "[v]ideos are videos. They should be able to be available to either one of the investigations. . . . They're available for both investigations." The criminal investigator, Officer Carrejo, also neglected to request or inquire about any video recordings of the incident despite knowing about the presence of cameras in the jail. Lieutenant Etheridge stated that the criminal investigation division did not conduct a proper investigation because of its failure to collect all of the evidence. Lieutenant Etheridge further noted that, "[i]f I knew that [the criminal investigation division] wasn't conducting proper investigations in regards to collecting that video, by all means, I would have taken corrective action to . . . get that video in their hands."

This series of interconnected errors within the Brownsville Police Department that involved individual officers was separate from the general policy of non-disclosure of information from the internal administrative investigations. The general policy of non-disclosure was not a direct cause of Alvarez's injury. *See Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir. 1992) ("To form the basis of liability under § 1983, a municipal policy must be

affirmatively linked to the constitutional violation and be the moving force behind it.").

Second, this general policy of non-disclosure was not implemented with "deliberate indifference." To show deliberate indifference based on a single incident, there must be evidence that shows that it should have been apparent or obvious to the policymaker that a constitutional violation was the "highly predictable consequence" of the particular policy. *See Burge*, 336 F.3d at 373; *Brown v. Bryan County*, 219 F.3d 450, 461 (5th Cir. 2000). While it was established that information from internal administrative investigations is generally not shared, Sergeant Infante, Commander Avitia, Lieutenant Etheridge, and Police Chief Garcia still understood that this policy did not prohibit them from disclosing video recordings. Moreover, if Officer Carrejo requested or inquired about the existence of any videos of the incident, the videos would have been turned over. Because of the understanding throughout the police department that even with the policy that possibly exculpatory evidence such as the videos could be disclosed, it was by no means "apparent" that a constitutional violation was a "highly predictable consequence" of the general policy of non-disclosure. *See Burge*, 336 F.3d at 373. Put another way, it can not be "apparent" that a constitutional violation is a "highly predictable consequence" if no impression is created from the policy that the evidence central to the alleged violation has to be withheld. Accordingly, there was no "deliberate indifference" shown in implementing this policy. *See id.* (citing *Brown*, 219 F.3d at 461).

Even if this court adopts Alvarez's alternative theory that the "policy" was Police Chief Garcia being vested with the sole authority to review the internal administrative investigation reports, there is no showing that this policy was adopted or implemented with deliberate indifference. When

advancing this theory, Alvarez lodges two different concepts for how deliberate indifference was shown. First, Alvarez asserts that the policy of allowing Police Chief Garcia to be the sole decision maker relating to the internal investigations was deliberately indifferent because there was no safety net to catch Police Chief Garcia's mistakes. Second, Alvarez avers that Police Chief Garcia implemented this policy with deliberate indifference because he overlooked internal administrative reports, knowing that his error would probably result in the violation of an individual's constitutional rights.

Both of Alvarez's arguments are unavailing. Placing the final decision making authority in the hands of one individual, even if it makes an error more likely, does not by itself establish deliberate indifference. "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *James*, 577 F.3d at 617–18 (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992) (quotation marks omitted). No evidence from the record indicates that Police Chief Garcia's actions should be characterized as anything more than negligent oversight. Moreover, Alvarez points to no case from any circuit that premises § 1983 municipal liability on a policymaker's deliberate indifference to a constitutional right that a circuit court has expressly held does not exist—e.g., the defendant's right to be presented with *Brady* material before entering a guilty plea. No deliberate indifference was shown to establish municipal liability under this alternative theory proposed by Alvarez.

In conclusion, the City of Brownsville should not have been liable as a matter of law for Alvarez's § 1983 action.

**B. Extension of the *Brady* right to the Plea Bargaining Process**

Alvarez additionally argued to the en banc court that his guilty plea did not preclude him from asserting a viable *Brady* claim for his § 1983 action. Prior to this court granting Alvarez's petition for rehearing en banc, settled precedent in this circuit held that there was no constitutional right to *Brady* material prior to a guilty plea. *See United States v. Conroy*, 567 F.3d 174, 178–79 (5th Cir. 2009) (citing *Matthew v. Johnson*, 201 F.3d 353, 361–62 (5th Cir. 2000)). Alvarez argues that under *Brady* the videos of the incident between him and Officer Arias constituted exculpatory evidence that he was constitutionally entitled to before the entry of his guilty plea. *See* 373 U.S. at 87. This court declines the invitation to uproot its precedent.

In *United States v. Ruiz*, the Supreme Court held that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." 536 U.S. 622, 633 (2002). The Supreme Court stated that impeachment information was not "critical information of which the defendant must always be aware prior to pleading guilty." *Id*. at 630. The Supreme Court, however, did not explicitly address whether the withholding of exculpatory evidence during the pretrial plea bargaining process would violate a defendant's constitutional rights. *See id*. at 630–33.

In *Conroy*, this court addressed the scope of a defendant's constitutional entitlement to *Brady* material before he enters a guilty plea. 567 F.3d at 179. Unequivocally, the court rejected the defendant's argument that *Ruiz* states that impeachment and exculpatory evidence should be treated differently, and that exculpatory evidence must be turned over before the entry of a guilty plea. *Id*. This court stated, "*Ruiz* never makes such a distinction nor can this proposition be implied from its discussion. Accordingly, we conclude that [the

defendant's] guilty plea precludes her from claiming that the government's failure to disclose . . . was a *Brady* violation." *Id.*

The First, Second, and Fourth Circuits also seem to have doubts about a defendant's constitutional entitlement to exculpatory *Brady* material before entering a guilty plea. In *United States v. Mathur*, the First Circuit explained that, "[t]he animating principle of *Brady* is the avoidance of an unfair trial. It is, therefore, universally acknowledged that the right memorialized in *Brady* is a trial right." 624 F.3d 498, 506–07 (1st Cir. 2010) (internal citation omitted). Extending *Brady* to pretrial plea negotiations was characterized as "new ground," a "novel approach," and an "unprecedented expansion of *Brady*." *Id.* at 507. The First Circuit noted that "*Ruiz* teaches that *Brady* does not protect against the possible prejudice that may ensue from the loss of an opportunity to plea-bargain with complete knowledge of all relevant facts." *Id.* "[W]hen a defendant chooses to admit his guilt, *Brady* concerns subside." *Id.* ("The *Brady* rule's focus on protecting the integrity of trials suggests that where no trial is to occur, there may be no constitutional violation." (quoting *Matthew*, 201 F.3d at 361)).

Additionally, the Second Circuit in *Friedman v. Rehal* stated the "Supreme Court has consistently treated exculpatory and impeachment evidence in the same way for the purpose of defining the obligation of a prosecutor to provide *Brady* material prior to trial, and the reasoning underlying *Ruiz* could support a similar ruling for a prosecutor's obligations prior to a guilty plea." 618 F.3d 142, 154 (2d Cir. 2010) (internal citation omitted).

Likewise, the Fourth Circuit in *United States v. Moussaoui* emphasized that "[t]he *Brady* right . . . is a *trial* right" that "exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be

found guilty." 591 F.3d 263, 285 (4th Cir. 2010) (emphasis in original). The Fourth Circuit went on citing the Fifth Circuit's *Matthew* and *Orman* opinions, stating "[w]hen a defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted." *Id.* (citing *Orman v. Cain*, 228 F.3d 616, 617 (5th Cir. 2000); *Matthew*, 201 F.3d at 361). After acknowledging the circuit split for whether the *Brady* right extended to the guilty plea context, the Fourth Circuit did not decide the issue. *Id.* at 286.

The Seventh, Ninth, and Tenth Circuits, however, recognized the possible distinction noted by the Supreme Court in *Ruiz* between impeachment and exculpatory evidence in the guilty plea context. In *McCann v. Mangialardi*, the Seventh Circuit stated that "*Ruiz* indicates a significant distinction between impeachment information and exculpatory evidence of actual innocence." 337 F.3d 782, 788 (7th Cir. 2003). The Seventh Circuit went on to say, "[g]iven this distinction, it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors or other relevant government actors have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters into a guilty plea." *Id.* In the next line, the court explained that "[w]e need not resolve this question" because the plaintiff did not present evidence that the defendant was aware of the potential exculpatory evidence. *Id.*

In *United States v. Ohiri*, the defendant contended that the government committed *Brady* violations by failing to disclose exculpatory evidence prior to his decision to plead guilty. 133 F. App'x 555, 556 (10th Cir. 2005) (unpublished). The Tenth Circuit explained that the "government should have disclosed all known exculpatory information at least by that point in the proceedings" prior to the defendant's guilty plea entered on the first day of jury selection. *Id.* at 562. Notably, "the unusual circumstances presented" by the

No. 16-40772

defendant's acceptance of an "eleventh-hour plea agreement" on the day the defendant was set to go to trial was highlighted in the court's reasoning. *See Ohiri*, 133 F. App'x at 562. The Tenth Circuit emphasized that, unlike *Ruiz*, the evidence the prosecution withheld from the defendant was alleged to be exculpatory and not just impeachment evidence. *Id*. The court concluded by stating that "the Supreme Court [in *Ruiz*] did not imply that the government may avoid the consequence of a *Brady* violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession." *Id*.

Similarly, the Ninth Circuit alluded to possibly allowing a defendant to assert a *Brady* violation after pleading guilty. *See Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007) (en banc). When the Ninth Circuit referred to the defendant's ability to assert a *Brady* violation after pleading guilty, the court cited to a case predating *Ruiz* for the proposition that the defendant could still assert a viable *Brady* claim even though he pled guilty. *See id*. (citing *Sanchez v. United States*, 50 F.3d 1148, 1454 (9th Cir. 1995)).

In sum, case law from the Supreme Court, this circuit, and other circuits does not affirmatively establish that a constitutional violation occurs when *Brady* material is not shared during the plea bargaining process. The en banc court will not disturb this circuit's settled precedent and abstains from expanding the *Brady* right to the pretrial plea bargaining context for Alvarez.

### III.  CONCLUSION

For the foregoing reasons, we REVERSE the district court's judgment, and RENDER judgment in favor of the City of Brownsville. Alvarez's action against the City of Brownsville is DISMISSED with prejudice.

No. 16-40772

EDITH H. JONES, Circuit Judge, joined by SMITH and HO, Circuit Judges, concurring:

I am pleased to join Chief Judge Stewart's opinion for the court, with which I fully agree. The genesis of this case is, however, troubling, and worth noting. It is an unsavory vehicle in which to be discussing significant theories of law.

How Alvarez[1] obtained his habeas relief in the state appellate court, using his then-attorney Lucio, who later became a co-defendant in a federal RICO and bribery prosecution against then-Cameron County DA Villalobos, is more than suspicious. The state courts were presented a redacted video of the encounter between Alvarez and Officer Arias, which omitted a crucial 30+ seconds leading up to their tussle. In that period of time, it was evident that Alvarez was arguing with and resisting the officers' instructions to move from one cell into another. Unredacted, the video portrays a much more complex picture of events than the "self defense" theory propounded by attorney Lucio. Lucio also offered the supporting testimony of Alvarez's former attorney, de la Fuente, an unindicted co-conspirator in the bribery case. In the state habeas court, the DA's office, oddly, never questioned the video, immediately agreed to a new trial, and apparently offered an agreed set of findings and conclusions. That court granted only a new trial. When Lucio appealed to the state appellate court on his "actual innocence" theory—which is supportable only if one sees no more than the redacted video—the DA filed no response. After the appellate court remanded, the DA quickly dismissed charges. One may

---

[1] I have no knowledge whether Alvarez had any information about the attorneys' deeds in his case.

surmise, as Gilbert & Sullivan wrote in *Trial by Jury*, Alvarez's release "was managed by a job, and a good job too."

For present purposes, the point is that without having been "exonerated" by the state courts, Alvarez could not pursue his very novel Section 1983 claim against the City. *See Heck v. Humphrey*, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 2372 (1994). Alvarez's damage suit proceeded contemporaneously in federal court with the RICO/bribery charges against the former DA and his attorney cohorts. Indeed, the judge originally assigned to Alvarez's case had to recuse when he became responsible for the criminal case. In the bribery prosecution, Alvarez's habeas case was mentioned indirectly. The City's attorneys attempted repeatedly to challenge the redacted video in Alvarez's civil suit, but the federal court ignored their efforts. Why? I do not understand the district court's unwillingness to explore whether Alvarez's case was founded on doctored evidence. If doctored evidence tainted Alvarez's habeas case, the federal court would have had to consider ethical action against certain attorneys. On the other hand, it would not have had to opine on unusual issues concerning municipal liability and the ramifications of the *Brady* doctrine.

Allegations of doctored evidence here may have been misplaced, but surely they were not frivolous. Because factual integrity is the gateway to litigating a claim in court, Fed. R. Civ. P. 11, integrity in the fact-finding process must be maintained vigilantly. No defendant, including the City, should be persecuted by means of litigation with a false foundation. It's unfortunate if that is what happened here.

I urge our colleagues at the district court level to be more attuned to non-frivolous complaints of potentially unethical behavior.

No. 16-40772

STEPHEN HIGGINSON, Circuit Judge, joined by JOLLY, JONES, WIENER and OWEN, Circuit Judges, concurring:

Criminal discovery rules and practices vary. In federal criminal cases, discovery practices are responsive to local court and professionalism requirements, notably the United States Attorney's Manual;[1] the rulemaking process—itself dynamic and receptive to change urged by criminal justice participants—notably Fed. R. Crim. P. 16 (Discovery and Inspection); legislative initiatives, notably the Jencks Act, 18 U.S.C. 3500; and, judicial decisions elaborating the due process imperative for fundamental fairness, notably *Brady v. Maryland*, 373 U.S. 83 (1963).

I write in agreement with the majority that we should not stretch the last by constitutionalizing *Brady* forward in time from a fair trial right ("existing *Brady*") to a pre-plea right ("new *Brady*"), as well as to observe that the Who, What and When components of any new disclosure obligation be described with clarity to prosecutors, defense counsel and trial judges.

*Who owes new Brady disclosure (after what, if any, search)?* Existing *Brady* law imposes constructive knowledge on the government, *see, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). If an earlier-in-time, new *Brady* right is recognized, the orbit of government responsibility must be drawn. Guilty plea agreements which offer benefits to defendants are vitally important to

---

[1] *See e.g.* U.S.A.M. 9-5.001(D) (Timing of disclosure); *id.* 9-5.001(D)(1) ("Exculpatory information must be disclosed reasonably promptly after it is discovered."); *id.* 9-11.233 ("It is the policy of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person.").

accused persons yet remain a matter of executive discretion. Those plea agreement offers may well be withheld if a *Brady* imputation rule applies to prosecutors when a matter is still being investigated with disparate law enforcement involvement, especially when law enforcement is responding to reactive crimes and arrests. Or plea agreement offers may come only with a waiver of any such new *Brady* right. *Cf. United States v. Sylvester*, 583 F.3d 285, 293-294 (5th Cir. 2009) (allowing case-in-chief plea statement waivers). Or they may come slowly, after coordinated due diligence review of investigative materials, regardless of whether a defendant seeks to avoid pretrial detention and the possibility of superseding charges by accepting responsibility and pleading guilty quickly.

*What must be disclosed?* The answer seems to be *Brady* minus *Ruiz*, yet that would revive difficult distinctions between exculpatory and impeachment evidence which bedeviled earlier due process caselaw. *See United States v. Bagley*, 473 U.S. 667, 676 (1985).

*When must disclosure occur?* The constitution does not prevent accused persons from acknowledging responsibility and guilt, yet any new *Brady* rule likely would require prosecutors to collect and review existing evidence first, perhaps, as noted, seeking pretrial detention during that time, as well as, thereafter, superseding with additional charges if more, not less, incriminating evidence is found. Depending on the timing of any new *Brady* rule, especially one triggered by a defendant's stated intention to plead guilty, courts may need to anticipate pretrial detention requests against defendants who seek to plead guilty as well as requests for in camera submissions or protective orders to safeguard victims and witnesses.

Fairness and truth-finding are imperatives. *Berger v. United States*, 295 U.S. 78, 88 (1935). For that reason, it is worthwhile to emphasize that the

No. 16-40772

constitution *already protects against prosecutors* who use false evidence to obtain a conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150 (1972); *cf. Ferrara v. United States*, 456 F.3d 278, 291-297 (1st Cir. 2006) (nondisclosure "so outrageous that it constituted impermissible prosecutorial misconduct sufficient to ground the petitioner's claim that his guilty plea was involuntary").[2]

And the constitution *already protects against ineffective assistance of counsel*, which occurs regardless of the attractiveness of a plea offer if counsel, in the best position to have ascertained innocence, fails to "investigate[] the law and circumstances" relating to a defendant's guilty plea. *See United States v. Juarez*, 672 F.3d 381, 390 (5th Cir. 2012); *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Finally, the constitution already assures further protection against the miscarriage of justice of an innocent pleading guilty by requiring that *judges* engage in extended, direct colloquy with *defendants* who seek to confirm their guilt under oath. *Boykin v. Alabama*, 395 U.S. 238 (1969); Fed. R. Crim. P. 11(b)(1). Judges must confirm that a factual basis supports every guilty plea. *See* Fed. R. Crim. P. 11(b)(3); *cf. United States v. Gobert*, 139 F.3d 436, 439-441

---

[2] Furthermore, existing Brady is a continuing duty, *United States v. Cessa*, 861 F.3d 121, 134 n.8 (5th Cir. 2017) ("*Brady* obligations are continuing throughout trial, and are neither dependent on a request from the defendant nor the form of the *Brady* material."), and extends to sentencing, *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963), thus may be violated if a prosecutor withholds evidence which contradicts a presentence report offense narrative the government relies on. As with a proffer of a factual basis at rearraignment, endorsement of a presentence report will occur during the period when defendants may seek to withdraw their guilty pleas and any existing *Brady* obligation and disclosure triggered by use of a factual basis or presentence report may well qualify as a "fair and just reason for requesting withdrawal." Fed. R. Crim. P. 11(d).

No. 16-40772

(5th Cir. 1998) (finding clear error in acceptance of guilty plea without adequate factual basis).[3]

---

[3] Indeed, judges frequently ask defendants to confirm their guilt in their own words. This may be particularly advisable when defendants and the government submit plea agreements with especially favorable terms for court acceptance. Fed. R. Crim. P. 11(c)(2)-(5).

No. 16-40772

JAMES C. HO, Circuit Judge, joined by E. GRADY JOLLY, EDITH H. JONES, JERRY E. SMITH, EDITH BROWN CLEMENT, and PRISCILLA R. OWEN, Circuit Judges, concurring:

A number of circuits are openly flirting with, if not embracing outright, a novel alteration of the constitutional doctrine first announced in *Brady v. Maryland*, 373 U.S. 83 (1963). *See*, *e.g.*, *Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007) (en banc) (citing *Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir. 1995)); *United States v. Ohiri*, 133 F. App'x 555, 562 (10th Cir. 2005) (unpublished); *McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003).

Under *Brady*, the defendant has the right to review exculpatory material from the prosecution team in order to prepare for trial. Under the proposed new rule, the prosecution team is now required to disclose such material, even if the accused does not want it, and instead seeks to plead guilty—and if the accused does not receive the material, he can later nullify the plea agreement.

The proposed rule is foreclosed by circuit precedent. And Chief Judge Stewart's en banc majority opinion expressly declines any invitation to overrule our precedent. I am pleased to join his excellent opinion.

I write separately to make two points about precedent. First, there was no justification for the district court to ignore our circuit precedent. Second, our circuit precedent was correctly decided. Indeed, it is compelled by established principles of constitutional law: *Brady* announced a right to exculpatory evidence as part of the right to a fair trial. Pleading guilty waives the right to a trial, and inherent in that waiver is the waiver of subsidiary trial rights such as *Brady*. The district court contradicted these established principles when it extended *Brady* to the plea bargaining stage and treated it not as a right of the accused, but as a requirement defendants cannot waive.

I concur in the reversal of the district court.

24

No. 16-40772

I.

If the constitutional theory urged by George Alvarez and his amici had been an open question in this circuit, the district court could have attempted to justify its judgment on either the text or original understanding of the Constitution or on a faithful application of analogous Supreme Court or circuit precedent.

But that is not this case. To the contrary, the district court awarded a $2.3 million judgment based on a constitutional theory that our previous rulings expressly foreclose. *See United States v. Conroy*, 567 F.3d 174, 178–79 (5th Cir. 2009) (per curiam) (citing *Matthew v. Johnson*, 201 F.3d 353, 361–62 (5th Cir. 2000)). What's more, the district court did not even cite—let alone distinguish—our prior precedents.

In describing the judicial power established in Article III of the Constitution, Federalist 78 observes that, "[t]o avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them." THE FEDERALIST NO. 78 (Alexander Hamilton).

Consistent with these foundational constitutional principles, it is long established that district courts are bound to follow circuit precedent unless it directly conflicts with Supreme Court precedent. *See, e.g.*, *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992) ("It has been long established that a legally indistinguishable decision of this court must be followed by other panels of this court and district courts unless overruled en banc or by the United States Supreme Court.").

No. 16-40772

In the event of such a conflict, Supreme Court precedent of course plainly controls. But there is no such conflict here: The Supreme Court has *never* held that *Brady* establishes an unwaivable right at the plea bargaining phase.

To the contrary, the Supreme Court has held precisely the opposite in the context of two different categories of *Brady* material. *See United States v. Ruiz*, 536 U.S. 622 (2002). First, prosecutors need not disclose exculpatory impeachment evidence at the plea bargaining stage, as Chief Judge Stewart explains. *See* Op. at 14–17 (citing *Ruiz*, 536 U.S. at 630–33). Moreover, prosecutors need not disclose exculpatory evidence concerning any potential affirmative defense at the plea bargaining stage. *See Ruiz*, 536 U.S. at 633 ("We do not believe the Constitution here requires provision" of "information the Government has regarding any 'affirmative defense'" "prior to plea bargaining"); *see also id.* (Thomas, J., concurring) ("I agree with the Court that the Constitution does not require the Government to disclose either affirmative defense information or impeachment information relating to informants or other witnesses before entering into a binding plea agreement with a criminal defendant.").

Neither Alvarez nor his amici have explained why one rule should apply to exculpatory evidence concerning the prima facie elements of a criminal case, and a different rule should apply to exculpatory evidence concerning affirmative defenses. Certainly nothing in the text or original understanding of the Constitution supports such a distinction. And most importantly, no Supreme Court decision has ever so held (tellingly, the district court does not

No. 16-40772

even cite, let alone rely on, *Ruiz*).  So there was no basis for the district court to ignore binding circuit precedent.[1]

## II.

What's more, our circuit precedent is correct:  *Brady* is a trial right—and it is a right that the accused waives if he agrees to a plea bargain.

For his part, Alvarez argues that we should extend *Brady* from the trial stage to the plea bargaining stage—and that we should treat *Brady* as a requirement that a defendant cannot waive.  As his brief contends, courts should not only extend *Brady* to the plea bargaining phase, but also refuse to credit any waiver of *Brady* rights, on the ground that any such "waiver cannot be deemed 'intelligent and voluntary' [because it was] 'entered without knowledge of material information withheld by the prosecution.'" Supplemental Brief for Appellee at 36 (quoting *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995)).

He errs on both counts.  What's more, converting *Brady* from a right to a requirement would diminish, rather than enhance, its value to the accused.

## A.

First, it is well established that *Brady* is a *trial* right.  It is a right to exculpatory evidence that is part and parcel of the constitutional right to a fair trial under the Due Process Clause.

---

[1] Alvarez relies heavily on Supreme Court decisions that extend the requirement of effective assistance of counsel to the plea bargaining stage.  *See, e.g., Lafler v. Cooper*, 566 U.S. 156, 162–63 (2012); *Missouri v. Frye*, 566 U.S. 134, 140 (2012); *Padilla v. Kentucky*, 559 U.S. 356, 364–66 (2010).  But none of those cases purport to question or undermine the Court's earlier decision in *Ruiz* declining to extend *Brady* to the plea bargaining phase.  If there is conceptual tension in extending the effective assistance of counsel requirement to the plea bargaining stage, but not *Brady*, it has not troubled the Supreme Court.

No. 16-40772

The Supreme Court has repeatedly characterized the *Brady* right as necessary to ensure a fair trial—characterizations that contradict the suggestion that disclosure is additionally required to ensure the constitutionality of pre-trial proceedings.  In *United States v. Agurs*, 427 U.S. 97 (1976), for example, the Court observed that "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial."  *Id.* at 108.  *See also*, *e.g.*, *Ruiz*, 536 U.S. at 628 (describing *Brady* as "a right that the Constitution provides as part of its basic 'fair trial' guarantee") (citing U.S. CONST. amend. V, VI; *Brady*, 373 U.S. at 87); *United States v. Bagley*, 473 U.S. 667, 675 (1985) ("The *Brady* rule is based on the requirement of due process. . . . [A prosecutor must] disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."); *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("[U]nder *Brady* . . . the prosecution has the 'duty under the due process clause to insure that "criminal trials are fair" by disclosing evidence favorable to the defendant upon request.'") (citation omitted).

The entire purpose of plea bargains, of course, is to avoid the need for trial altogether.  Extending *Brady* to the plea bargaining phase thus contradicts the established understanding of *Brady* as a trial right.  As Justice Thomas observed in *Ruiz*: "The principle supporting *Brady* was 'avoidance of an unfair trial to the accused.'  That concern is not implicated at the plea stage."  *Ruiz*, 536 U.S. at 634 (Thomas, J., concurring) (citation omitted).

B.

The proposed new rule also misunderstands the basic nature of plea bargains.  Plea bargains, by their very definition, involve the waiver of a number of fundamental rights.

No. 16-40772

First and foremost, plea bargains waive the right to trial itself. What's more, inherent in the waiver of trial is a waiver of all rights attendant to a fair trial—such as the Fifth Amendment right against self-incrimination, the Sixth Amendment rights to a trial before a jury, to confront one's accusers, and to obtain compulsory process, and the right to disclosure of exculpatory evidence under *Brady*. *See*, *e.g.*, *Florida v. Nixon*, 543 U.S. 175, 187 (2004) ("By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers.") (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)); *Godinez v. Moran*, 509 U.S. 389, 397 n.7 (1993) (same); *Winters v. Cook*, 489 F.2d 174, 179 (5th Cir. 1973) (en banc) ("[P]ersonal fundamental rights include the right to plead guilty (which of course encompasses the waiver of numerous rights), the right to waive trial by jury, the right to waive appellate review and the right to testify personally.") (citing *Developments in the Law—Federal Habeas Corpus*, 83 HARV. L. REV. 1038, 1011 n. 102 (1970)).

The point is simply this: The Constitution enumerates a series of rights of the accused—but the defendant may waive those rights, for example, in exchange for leniency in a plea agreement. There is no reason to treat *Brady* any differently. To the contrary, to regard *Brady*, not as a right that the accused can waive, but as a requirement that prosecutors must obey, would be incongruous with our approach to other similar constitutional doctrines.

No one would claim, for example, that plea bargaining itself is unconstitutional—even though it inherently involves the right to trial under the Sixth Amendment. *See*, *e.g.*, *Brady v. United States*, 397 U.S. 742, 748 (1970) ("[T]he plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a

trial—a waiver of his right to trial before a jury or a judge."); *Adams v. United States ex rel. McCann*, 317 U.S. 269, 276 (1942) ("It hardly occurred to the framers of the original Constitution and of the Bill of Rights that an accused, acting in obedience to the dictates of self-interest or the promptings of conscience, should be prevented from surrendering his liberty by admitting his guilt.").

It is likewise well established that the accused has the right to waive the right to jury trial in favor of a bench trial. *See, e.g.*, *Adams*, 317 U.S. at 278 ("[S]ince trial by jury confers burdens as well as benefits, an accused should be permitted to forego its privileges when his competent judgment counsels him that his interests are safer in the keeping of the judge than of the jury."). *See also generally* Erwin N. Griswold, *The Historical Development of Waiver of Jury Trial in Criminal Cases*, 20 VA. L. REV. 655 (1934) (collecting materials).

Similarly, no one here argues that the accused has an unwaivable Sixth Amendment right to confront one's accusers or to have compulsory process to secure favorable witnesses, prior to agreeing to a plea bargain. Indeed, such an argument would effectively invalidate numerous codes of criminal procedure that generally do not permit pre-trial depositions absent special circumstances. *See, e.g.*, Tex. Code Crim. Proc. § 39.02; La. Code Crim. Proc. art. 716; Miss. R. Crim. Proc. 17.5. Otherwise, in every rape or sexual abuse case, for example, the victim would be required to endure a deposition by the accused, even where the accused is willing to plead guilty and forgo trial.

Neither Alvarez nor his amici offer any principled distinction as to why—among these various trial rights, all waivable upon a plea bargain—*Brady* should be treated any differently.

No. 16-40772

C.

To convert *Brady* from a right to a requirement would not only defy established principles of constitutional law. It would also diminish the value of those fundamental rights to the accused.

Rights are most valuable when individuals have the choice not to invoke them, depending on the circumstances. An old legend tells how the King of Siam would bestow sacred white elephants upon his political rivals. As gifts from the king, the elephants could not be rejected. Yet the sacred pachyderms, which could not be sold or used for work, would inevitably eat their owners out of house and home—driving them into bankruptcy, and leaving them far worse off than before they received the "gift."

Forcing unwaivable "rights" upon the accused can have a similar effect. We empower the accused when we allow them to waive their rights. From the defendant's perspective, the way to maximize the value of a right is to give him the option to waive it, just in case (as is often the case) he can exchange it for something else that is even more valuable to him. As the Supreme Court once put it: "When the administration of the criminal law in the federal courts is hedged about as it is by the Constitutional safeguards for the protection of an accused, *to deny him in the exercise of his free choice the right to dispense with some of these safeguards . . . is to imprison a man in his privileges and call it the Constitution.*" *Adams*, 317 U.S. at 280 (emphasis added).

The power to waive trial rights provides the accused with a significant bargaining chip in plea negotiations. Prosecutors lack the resources to take every case to trial. So prosecutors have a natural incentive to offer plea deals with lower penalties than what the accused might receive from a trial. "Plea bargaining flows from 'the mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial."

No. 16-40772

*Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). And the flip side is also true: giving prosecutors "a reduced incentive to bargain" will accrue "to the detriment of the many defendants for whom plea bargaining offers the only hope for ameliorating the consequences to them of a serious criminal charge." *Blackledge v. Perry*, 417 U.S. 21, 37 (1974) (Rehnquist, J., dissenting).

These principles apply to *Brady*. A defendant who agrees to waive his *Brady* right relieves the prosecution team of the substantial burdens associated with identifying, assembling, and disclosing the range of exculpatory materials required under *Brady*—as explained further in Judge Higginson's thoughtful concurrence. Converting the *Brady* right into a prosecutorial requirement would substantially upset this balance, by giving defendants less to offer the prosecution during the negotiations. Prosecutors may be less likely to offer deals at all, if they are forced to expend significant resources regardless of whether the case is pled or proceeds to trial. Or they might offer inferior plea deals, in the form of longer sentences. Either result is a materially worse outcome for the accused.

\* \* \*

There are times when it is necessary to upset circuit precedent—for example, in direct response to squarely conflicting Supreme Court precedent, or (where the Supreme Court has not yet ruled) to better align our precedents with the text and original understanding of the Constitution or the plain language of United States statutes. But that is not this case.

To the contrary, the alteration of our circuit's *Brady* precedents urged by Alvarez and his amici would violate established legal principles and even diminish the value of *Brady* to the accused. If there is a case to be made for such reform, it must be accomplished through one of the mechanisms established by our Founders, such as Article V of the Constitution, or through

No. 16-40772

the proper exercise of legislative powers vested in Congress and in the several states. *Cf. Brady*, 373 U.S. at 92 (separate opinion of White, J.) ("I would leave this task, at least for now, to the rulemaking or legislative process after full consideration by legislators, bench, and bar.").

I concur in the reversal of the district court.[2]

---

[2] I also agree with the majority's reliance on *Monell*. And I recognize that *Monell* alone is enough to reverse the judgment of the district court—we did not have to undertake the additional effort of addressing *Brady* in order to decide this appeal. But our Court granted rehearing en banc to reach the *Brady* question—and it is a question our dissenting colleagues address as well—so accordingly, I examine the *Brady* issue presented here.

No. 16-40772

JAMES L. DENNIS, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion because, in my view, the en banc court should have recognized the federal constitutional right of a defendant to exculpatory evidence at the plea-bargaining stage, essentially for the reasons described in Judge Costa's dissent.  I also join Part 1 of Judge Graves's dissent, in which he explains how the City's policy of nondisclosure of exculpatory evidence caused a violation of Alvarez's right to the exculpatory video that ultimately exonerated him, prior to entering his guilty plea.

No. 16-40772

JAMES E. GRAVES, JR., Circuit Judge, joined by COSTA, Circuit Judge, dissenting[1]:

I write separately to: (1) dissent from the majority's moving force analysis; (2) dissent from the majority's deliberate indifference analysis; and (3) address Brownsville's egregiously inadequate training policies.

## 1.    Non-disclosure policy was moving force for non-disclosure.

The majority states that the Brownsville Police Department's ("BPD") failure to disclose the video evidence was the result of a "series of interconnected errors" by individual officers that was "separate from" official BPD policy. I respectfully disagree.

"[T]here can be no municipal liability unless [an official policy] is the moving force behind the constitutional violation." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009). "In other words, a plaintiff must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." *Id.* (quoting *Piotrowski v. Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)). Whether a sufficient causal link exists is a question of fact. *See Jett v. Dall. Indp. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Kirkpatrick v. Washoe*, 843 F.3d 784, 797 (9th Cir. 2016); *James*, 577 F.3d at 618; *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

Here, as part of the internal affairs division ("IAD") investigation, Officer Arias created a use of force report and submitted it up his chain of command to Sgt. Infante and Commander Rodriguez. Infante and Rodriguez then reviewed the report, and the video evidence, and submitted their own individual reports to Chief Garcia. Garcia never reviewed the file, and none of the officers disclosed the videos outside of the IAD.

---

[1] Judge Dennis joins part 1.

Meanwhile, Officer Carrejo, the criminal investigations division ("CID") officer assigned to submit the case file to the District Attorney, obtained the IAD incident reports from the jail. Carrejo then submitted those reports to the District Attorney without conducting additional evidentiary investigation because there was no "evidence form" in the records alerting him that relevant evidence existed.

According to the majority, these actions were a "series of interconnected" errors by the officers involved. With respect, record evidence shows that the officers committed no errors at all under BPD policies.

CID investigators are responsible for providing criminal case files to the District Attorney's office. To start that process, they collect documents, such as incident reports, from a "cubbyhole" at the jail designated for the CID case prep team. They then conduct evidentiary follow-up as needed, based largely on "evidence forms" that fellow officers attach to the files provided to CID. Without an evidence form in the file, CID investigators would be unaware that follow-up is necessary.

BPD has a policy, however, that IAD officers do not proactively disclose evidence, including *Brady* evidence, to CID investigators. Instead, IAD officers pass all *Brady* evidence up their chain of command to Chief Garcia, who has sole responsibility to ensure that any *Brady* evidence is properly disclosed. Because these officers do not disclose evidence, there is no "evidence form" generated for the CID case file.

Thus, contrary to the majority's view, the officers committed no "interconnected errors" in conducting their investigation. The IAD officers faithfully passed the evidence up the chain of command to Chief Garcia without disclosing the evidence to CID. In turn, the CID officer, unaware that relevant evidence existed, conducted no evidentiary follow-up and simply

passed the file to the District Attorney's office. This was not error, it was how the system was designed to work.

Moreover, while the majority characterizes Garcia's failure to review the file as nothing "more than negligent oversight," the record paints a different picture. Indeed, Garcia did not review nine out of thirteen known use of force cases. Even when Garcia did review such files, it may be "several weeks, even up to a month or more . . . after the criminal case had been submitted to the [D]istrict [A]ttorney's office." Garcia's failure to review the instant case was entirely in line with BPD practice.

I therefore respectfully dissent from the majority's conclusion that Alvarez has not established that the non-disclosure policy was the moving force behind the alleged violation. BPD's policy of not disclosing exculpatory evidence to CID investigators was the direct cause of BPD's failure to disclose the video evidence to the District Attorney and the defense.

## 2.    Non-disclosure policy implemented with deliberate indifference.

The majority next concludes that BPD could not have implemented the non-disclosure policy with deliberate indifference because there was an "understanding throughout the police department" that IAD officers could disclose exculpatory evidence. With respect, that conclusion is not supported by the record evidence.

Though BPD officers did claim that they "should," "could," and "would" have disclosed the video evidence to the CID if asked to do so, the overwhelming weight of the evidence is that officers understood that IAD evidence was simply not shared with CID as a matter of policy.

For instance, officers were trained to consider IAD and CID as separate investigative tracts that operate independently. As a result, there was a

widespread belief among IAD officers that they had no duty to confirm that CID had exculpatory evidence. Instead, IAD officers simply passed evidence up their chain of command without disclosure to, or even consideration of, any parallel CID investigation. That understanding was based on "in-service training."

In contrast, there is no evidence to support the officers' claims that IAD officers would, could, or should freely disclose evidence to the CID. Quite the opposite is true, as no BPD policy, commanding officer, or training, informed IAD officers that they could, or even should, do so.

Compounding this problem, BPD provided CID investigators with no training on how to conduct their investigations. Instead, CID officers act purely pursuant to on-the-job experience. For Carrejo, that "mostly consists of getting ahold of victims or witnesses and get[ting] whatever information is needed for the file." Carrejo expects fellow officers to "book" relevant evidence in order to generate an "evidence report,"[2] so that Carrejo can then "follow up with that evidence." There is no indication in the record that Carrejo received any training, or even instruction, to pursue the robust evidentiary investigation that Brownsville, and the majority, claims he should have done. There is likewise no evidence at all that CID investigators ever asked IAD for evidence.

I respectfully dissent from the majority's conclusion that there was an "understanding throughout the police department" that IAD officers could disclose exculpatory evidence. The weight of the evidence states otherwise.

I also disagree with the majority opinion's conclusion that a deliberate indifference theory of municipal liability was not viable because at the time we

---

[2] These evidence reports were among the many topics on which BPD failed to train its CID officers.

had not recognized a pre-plea right to *Brady* material.  The City never made this "clearly established" argument in the district court or in our court.  By adopting it sua sponte, the court repeats the mistake we recently made in *Hernandez v. Mesa*, 785 F.3d 117 (5th Cir. 2015) (en banc).  We held that a border patrol agent was entitled to qualified immunity for shooting a Mexican national because the law was not clearly established that the Fifth Amendment applied to a foreign citizen injured outside the United States.  *Id.* at 121.  The Supreme Court reversed, explaining that the agent did not know at the time of the shooting whether the victim was a U.S. citizen.  137 S. Ct. 2003, 2007 (2017).  The same is true for the similar deliberate indifference inquiry here.  When he failed to disclose the exculpatory video, Police Chief Garcia did not know that Alvarez was pleading guilty.  Even more than in *Mesa*, he could not have known as that fact did not yet exist (that is, the plea decision had not yet been made).  But Garcia knew that the way to comply with the *Brady* obligation that has long existed for cases that go to trial is to notify the criminal investigations division of exculpatory material in the IA file so it becomes part of the prosecutor's file later disclosed to the defense.  There was not one procedure for transferring exculpatory evidence from the IAD side to the investigations side for "trial" cases and a separate procedure for "plea" cases.  Because that transfer of the video to the investigations division did not happen, Garcia was deliberately indifferent to the long recognized *Brady* right for cases that get tried.

It is true that some caselaw suggests that deliberate indifference liability applies only when the indifference is to a clearly established right.  The idea, the same rationale for qualified immunity, is that liability should attach based on an individual's conduct only if there is a knowing violation of constitutional law.  That culpability exists here because Garcia was deliberately indifferent

39

to his constitutional obligation to turn over exculpatory evidence for a case that, like any other, could have resulted in a trial with the long recognized *Brady* right. Once that deliberate indifference to a clear constitutional right is established, it is just a matter of causation to show that the deliberate indifference to ensuring the criminal file contained exculpatory material led to Alvarez's constitutional injury that Judge Costa's opinion recognizes.

The defect in the majority opinion on this point can be seen by imagining this same case but with Alvarez having gone to trial on the criminal charge. Under the majority opinion's analysis, Garcia could avoid liability by saying "well, when I failed to give the video to the criminal investigators, I thought he was probably going to plead. And it is not clearly established that I have to turn over exculpatory evidence when defendants plead." That defense should not immunize the City from liability because Garcia did not know how the criminal case would be resolved when he failed to disclose the video to the investigative side. Thus, (1) Garcia was deliberately indifferent to the clear-as-can-be *Brady* rights that defendants going to trial have, and (2) Garcia's deliberate indifference caused the violation of Alvarez's right to pre-plea *Brady* materials.

### 3.    BPD training policy was constitutionally deficient.

Though the majority does not address Alvarez's claim that Brownsville failed to adequately train its officers on *Brady* rights, I do so because BPD's training policy, or rather complete lack thereof, is so deficient that it clearly exhibits deliberate indifference to the constitutional rights of those that come into contact with BPD officers.

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton v.*

*Harris*, 489 U.S. 378, 388 (1989). "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

As Chief Garcia acknowledged, it is foreseeable that BPD officers will encounter use of force incidents and, as a result, have to decide what evidence to disclose in their reports. Garcia further acknowledged that officers will choose what evidence to disclose "based on the type of training they receive." Despite this foreseeability, BPD had "no policy" of providing training on *Brady*. Indeed, Chief Garcia could not even state whether any of his officers had *ever* touched on *Brady* at any time. At best, Garcia claimed only that BPD officers had "[m]aybe" covered *Brady* in non-BPD trainings - in some cases up to 30 years in the past.

Unsurprisingly, BPD officers suffer from widespread ignorance on *Brady* rights. Chief Garcia candidly admitted that "it would not surprise" him to learn that his officers did not know what *Brady* obligations are. Nor should it. Officer Arias did not know what "exculpatory" meant, and Officer Carrejo, the CID officer assigned to provide evidence to the District Attorney, was likewise "not familiar."

That such a complete failure to train on *Brady* rights is "likely to result in the violation of constitutional rights" is "obvious," *see Canton*, 489 U.S. at 390, because "in the absence of training, there is no way for novice officers to obtain the legal knowledge they require." *Connick v. Thompson*, 563 U.S. 51, 64 (2011). Naturally, the resulting "[w]idespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable

consequence' of due process violations." *See Gregory v. Louisville*, 444 F.3d 725, 753 (6th Cir. 2006).

Brownsville's complete lack of training on *Brady* rights evidences "deliberate indifference to the [constitutional] rights of persons with whom the police come into contact." *See Canton,* 489 U.S. at 388; *see also Gregory*, 444 F.3d at 753-54.

## CONCLUSION

The district court thought the evidence showing municipal liability was so strong that it granted summary judgment on that issue in favor of the plaintiff.  The majority opinion does a 180-degree turn and holds there is no municipal liability as a matter of law.  For the reasons I have discussed, at a minimum, there are factual disputes that a jury should resolve on municipal liability.  I respectfully dissent.

No. 16-40772

GREGG COSTA, Circuit Judge, joined by GRAVES, Circuit Judge, dissenting:

Let this sink in: If George Alvarez had been convicted of a federal crime in this circuit, he would have served his full 10-year sentence despite eventually discovering that the government failed to disclose an exculpatory video. That is because we are the only federal court of appeals that has held that a defendant who pleads guilty is not entitled to evidence that might exonerate him. Fortunately for Alvarez, and for those who believe that "justice suffers when any accused is treated unfairly," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), he was convicted of a state offense.[1] For almost forty years, Texas has interpreted the federal *Brady* right to require the government to provide exculpatory information "to defendants who plead guilty as well as to those who plead not guilty." *Ex parte Lewis*, 587 S.W. 2d 697, 701 (Tex. Crim. App. 1979); *see also Ex parte Johnson*, 2009 WL 1396807, at *1 (Tex. Crim. App. May 20, 2009) (vacating a guilty plea because of a *Brady* violation). Texas is not alone. The highest courts of other states that have considered this question agree that defendants have a federal due process right to exculpatory evidence before they plead guilty. *See Buffey v. Ballard*, 782 S.E.2d 204, 218 (W. Va. 2015); *State v. Huebler*, 275 P.3d 91, 96–97 (Nev. 2012); *Hyman v. State*, 723 S.E.2d 375, 380 (S.C. 2012); *Medel v. State,* 184 P.3d 1226, 1235 (Utah 2008). Because we now have "for the most part a system of pleas, not a system of trials," *Lafler v. Cooper*, 566 U.S. 156, 170 (2012), today's opinion reaffirming our outlier position means that the vast majority of defendants in this circuit

---

[1] In its amicus brief, the Department of Justice points to the grant of habeas relief in Alvarez's case as an example of the "existing remedies . . . typically available to defendants who admit their guilt but later claim actual innocence" that makes a *Brady* right unnecessary for such defendants. U.S. Br. 13. This ignores that federal habeas law, whether reviewing state or federal convictions, would not provide that relief because it does not recognize a freestanding innocence claim. *Herrera v. Collins*, 506 U.S. 390, 400 (199).

43

will not have a right to relief if it comes to light after their conviction that the government suppressed exculpatory evidence.

The origins of the *Brady* right support Texas courts' longstanding view that it requires pre-plea disclosure of exculpatory evidence. The seminal Supreme Court case describes the right as a due process requirement for a prosecutor, upon request, to disclose information favorable to the accused that "is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. Although the more common framing of the right is the first characterization that relates to "innocence or guilt," *Brady* itself was a case about punishment as the suppressed confession only resulted in a new sentencing trial. *Id.* at 90–91. It is notable that the right has from its inception applied to the sentencing phase of a proceeding that is vitally important but "does not concern the defendant's guilt or innocence." *Lafler*, 566 U.S. at 165. Because a plea hearing is all about a defendant's guilt or innocence, it more strongly implicates *Brady*'s "overriding concern with the justice of the finding of guilt." *United States v. Bagley*, 473 U.S. 667, 678 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976). It certainly does so more directly than does a suppression hearing where the focus is on whether the government unlawfully obtained evidence, *see United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999), yet we have recognized the *Brady* right extends to suppression motions. *Smith v. Black*, 904 F.2d 950, 965–66 (1990), *vacated on other grounds*, 503 U.S. 930 (1992). And the *Brady* rule seeks "to ensure that a miscarriage of justice does not occur," *Bagley*, 473 U.S. at 675, a risk that we know exists not just for trial convictions but also for guilty pleas, *see Brady v. United States*, 397 U.S. 742, 758 (1970) (recognizing that plea agreements are "no more foolproof than full trials"); Stephanos Bibas, *Plea Bargaining's Role in Wrongful Convictions*, in EXAMINING WRONGFUL CONVICTIONS 157–62 (2014) (discussing the incentives,

structural constraints, and psychological influences that can lead to innocent defendants pleading guilty); *infra* p. 16.

Digging deeper into the roots of *Brady* further supports its application to requests for exculpatory evidence before pleading. The 1963 decision relied on earlier Supreme Court cases recognizing a due process violation when the government knowingly used false testimony to secure a conviction. *See* 373 U.S. at 86–87 (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam); *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). At a plea hearing, the government must provide a factual basis for the defendant's guilt to support the conviction. See FED. R. CRIM. P. 11(b)(3); *cf. Brady v. United States*, 397 U.S. at 758 (explaining that a court's ability to determine "that there is nothing to question the accuracy and reliability of the defendants' admissions" provides an important safeguard against problems with plea agreements). Just as failure to provide exculpatory information at a trial subverts the jury's ability to determine guilt, so too does failure to provide that information in connection with a plea prevent the judge from properly assessing whether there is a factual basis to support a conviction. Failing to disclose exculpatory evidence in reciting the essential facts of the case thus is at odds with the government's constitutional duty to tell the truth in court.

Indeed, as a general matter due process rights are usually not limited to trials, but may apply in various types of proceedings at which the government seeks to deprive someone of life, liberty, or property. Other due process rights apply at plea hearings, most fundamentally the requirement that a plea be knowing and voluntary.[2] *McCarthy v. United States*, 394 U.S. 459, 466 (1969).

---

[2] Some courts have taken the view that a failure to disclose exculpatory evidence renders the plea unknowing and involuntary. *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995); *cf. United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013).

No. 16-40772

But also others like the government's obligation to fulfill its promises in a plea agreement. *Santobello v. New York*, 404 U.S. 257, 262 (1971). Looking even more broadly to the Fifth Amendment as a whole, none of its rights apply solely in trials. Protections against self-incrimination, takings, double jeopardy, and being charged without a grand jury indictment guard against arbitrary government action that can occur in a variety of contexts outside of trial. Although Fifth Amendment rights may appear to lack the unifying theme that is evident for the conscience and expression-protecting First Amendment, the trial-focused Sixth and Seventh Amendments (first criminal then civil); or the punishment-focused Eighth, one scholar has noted that most rights in the Fifth Amendment cover the period between the investigative phase addressed in the Fourth Amendment and the trial phase addressed in the Sixth. BURT NEUBORNE, MADISON'S MUSIC: ON READING THE FIRST AMENDMENT 26–27 (2015). The Amendment's focus on pretrial criminal proceedings rather than trials thus further supports requiring the disclosure of exculpatory evidence in the plea hearing.

So what is the basis for limiting a due process right like *Brady* to the context of a full-blown trial even though a plea hearing involves its core concern about whether the courts are fulfilling their truth-finding function? The most basic argument against applying *Brady* to pleas is that by pleading guilty the defendant implicitly waives a right to obtain evidence that might undermine his admission of guilt.[3] Put more bluntly, if a defendant is saying he is guilty, isn't that the end of the issue? But the same argument could be

---

[3] This is different than the question whether a defendant could affirmatively waive his *Brady* rights in pleading guilty. This case does not present that question as Alvarez requested full discovery from the defendant and never waived the *Brady* right that Texas courts afford all defendants.

made and was for ineffective assistance of counsel claims asserted by those who pleaded guilty.  If a defendant admitted guilt, how could he later complain that with better lawyering he might have been acquitted?  Indeed, the right to effective assistance of counsel was sometimes framed, as *Brady* has sometimes been, only as a fair trial right. *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (explaining that "in giving meaning to the requirement" of effective assistance, "we must take its purpose—to ensure a fair trial—as the guide"); *see also United States v. Cronic*, 466 U.S. 648, 658 (1984) ("[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial."); *see also* Michael Nasser Petegorsky, *Plea Bargaining in the Dark*, 81 FORDHAM L. REV. 3599, 3631 (2013) ("[L]ike *Brady*, the right to effective assistance was traditionally considered purely a trial right."). Yet the Supreme Court has long recognized that a defendant can undo a guilty plea by showing that ineffective assistance caused him to make that decision rather than proceed to trial.  *Hill v. Lockhart*, 474 U.S. 52, 56–57 (1985).  The Court's rejection of the view "that a knowing and voluntary plea supersedes error by defense counsel," *Missouri v. Frye*, 566 U.S. 134, 141 (2012), reflects a realistic view of modern plea bargaining, which is influenced by a variety of structural and psychological forces in addition to traditional notions of risk assessment.  *See* Stephanos Bibas*, Plea Bargaining Outside the Shadow of Trial*, 117 HARV. L. REV. 2463, 2507–10 (2004).  A defendant may even plead guilty while maintaining his innocence. *North Carolina v. Alford*, 400 U.S. 25 (1970).  As the Supreme Court has rejected the plea=waiver argument in the context of ineffective assistance

claims, it is hard to see how it has much force in the *Brady* context.[4]   *Lafler*, 566 U.S. at 164.

Another argument against applying *Brady* to pleas is that its materiality inquiry is often framed in terms of the impact the exculpatory information would have had on the trial.  *See Matthew v. Johnson*, 201 F.3d 353, 361–62 (5th Cir. 2000).[5]  But the materiality standard sometimes refers more broadly to the effect on a "proceeding."  *Bagley*, 473 U.S. at 682 ("[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").  That makes sense as *Brady* itself was a case about undisclosed evidence that required a new sentencing hearing but not a new trial.  373 U.S. at 90–91.  And looking to ineffective assistance case law is again instructive.  *Strickland*'s prejudice requirement developed in tandem with the *Brady* materiality standard.  In *Bagley*, the Court recognized it had "relied on and reformulated" the test for materiality from *Brady* cases (the *Augers* test) in *Strickland*.  473 U.S. at 681–82.  It then decided the same refined standard should apply in *Brady* cases, concluding "the *Strickland* formulation" was "sufficiently flexible to cover [all] cases of prosecutorial failure to disclose evidence favorable to the accused: [t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 682.  And as I have already noted, the Supreme Court recently rejected the argument that attorney errors "before

[4] Indeed, *United States v. Ruiz*, 536 U.S. 622 (2002), which will be discussed in more depth later, did not use a waiver rationale in rejecting a right to impeachment evidence before a plea.

[5] It is worth noting that *Matthew* did not review de novo the question of *Brady*'s application to pleas.  It was a habeas case so the holding was only that *Teague v. Lane*, 489 U.S. 288 (1989),  barred recognizing the right on collateral review.  201 F.3d at 369-70.

trial . . . are not cognizable under the Sixth Amendment unless they affect the fairness of the trial itself." *Lafler*, 566 U.S. at 164–65. It concluded "the right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions." *Id.* at 170. The materiality standard thus does not pose a problem because it is already applied in ineffective assistance cases to assess whether the absence of attorney error would have changed the plea decision. *Armstrong v.* Scott, 37 F.3d 202, 206 (5th Cir. 1994); *see also Huebler*, 275 P.3d at 203 (applying to a defendant who pleaded a *Brady* materiality standard asking "whether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant would have refused to plead and would have gone to trial"). It would be anomalous if the *Strickland* right that is found in the trial-focused Sixth Amendment applied to pleas but the due process *Brady* right did not.

The Department of Justice opposes a pre-plea *Brady* right in part because of its belief that such a rule "would impose serious costs on the criminal justice system" by making pleas less efficient. DOJ Amicus Brief 15. That concern is puzzling because, as it acknowledges, its own policy requires federal prosecutors to turn over exculpatory evidence "reasonably promptly after it is discovered." UNITED STATES ATTORNEY'S MANUAL (USAM) § 9-5.001(D)(1).[6]   Court rules in 20 federal judicial districts, including Local

---

[6] The U.S. Attorneys' Manual distinguishes between exculpatory and impeachment evidence. As mentioned above, the former must be disclosed "promptly after it is discovered." USAM § 9-5.001(D)(1). The latter must be disclosed "at a reasonable time before trial to allow the trial to proceed efficiently." *Id.* § 9-5.001(D)(2). That later in time disclosure of impeachment evidence may be further delayed if the benefits of pretrial disclosure are outweighed by "other significant interests—such as witness security or national security." *Id.* The exception for early disclosure of exculpatory information is narrower, limited to "classified or otherwise sensitive national security material." *Id.* § 9-5.001(D)(1).   This confirms that the costs of disclosing impeachment evidence pre-plea are greater than the

No. 16-40772

Criminal Rule 16 in the Western District of Texas which usually vies with the Southern District of Texas for the largest number of federal prosecutions each year, impose a more definite early disclosure requirement: *Brady* material must be disclosed within two weeks of arraignment, which in almost every case will be before a plea is entered. FEDERAL JUDICIAL CENTER, *BRADY V. MARYLAND* IN THE UNITED STATES DISTRICT COURTS: RULES, ORDERS, AND POLICIES 16 (2007) (table listing 20 districts that require *Brady* disclosures within two weeks of arraignment or when the defendant enters a "not guilty plea"). And ethical rules in a number of states, including all three that make up this circuit, require the same of prosecutors. TEX. DISCIPLINARY R. PROF'L CONDUCT § 3.09(d) (1989); LA. R. PROF'L CONDUCT § 3.08(d) (2004); MISS. R. PROF'L CONDUCT § 3.08(d) (all based on Rule 3.8 of the American Bar Association's Rules of Professional Conduct).[7] Indeed, DOJ cites its policy and the ethical rules as reasons why applying *Brady* to pleas is unnecessary. But if these policies and rules of professional responsibility are resulting in early disclosure of exculpatory evidence, wouldn't that impose the same costs that a corresponding *Brady* right would? The source of the disclosure obligation shouldn't change the cost of compliance. What is different is that a constitutional obligation provides the defendant with a remedy when a prosecutor fails to comply due to either negligence or malice. A violation of DOJ, court, or ethical rules would not have helped Alvarez when he learned

costs of disclosing exculpatory information, a factor that distinguishes the Supreme Court's *Ruiz* decision from the question we confront. *See infra* p. 10–11.

[7] MODEL RULES OF PROF'L CONDUCT R. 3.8(D) (2012) (requiring prosecutors to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense"); ABA COMM. ON ETHICS AND PROF'L RESPONSIBILITY, Formal Op. 09-454 (2009) (clarifying that disclosure must be made pre-plea to satisfy "significant purpose" of assisting defendants in making intelligent plea-bargaining decisions).

about the undisclosed video. *See* USAM § 1-1.100 (explaining that the U.S. Attorney's Manual does not create any rights enforceable in court).

But we do not have to guess whether requiring pre-plea disclosure of exculpatory evidence as a constitutional matter would inhibit plea bargaining. We can look to experience, as a number of jurisdictions have such a rule. *See Lafler*, 566 U.S. at 164, 172 (discounting administrability and "floodgate" concerns about applying ineffective-assistance-of-counsel claims to the rejection of plea agreements because a number of circuits had already done so "without demonstrated difficulties or systemic disruptions"); *cf.* Jeffrey S. Sutton, 51 IMPERFECT SOLUTIONS: STATES AND THE MAKING OF AMERICAN CONSTITUTIONAL LAW 2 (observing that when state courts have recognized a right under state constitutions, their experience can influence administrability concerns with recognizing a corresponding right under federal law). Since 1979, Texas state courts have read the Due Process Clause to require disclosure of exculpatory evidence to defendants who plead guilty. A number of other states read *Brady* the same way. *See Buffey v. Ballard*, 782 S.E.2d 204, 216 (W. Va. 2015); *State v. Huebler*, 275 P.3d 91, 96–97 (Nev. 2012); *Hyman v. State*, 723 S.E.2d 375, 380 (S.C. 2012); *Medel v. State,* 184 P.3d 1226, 1235 (Utah 2008); *State v. Gardner*, 885 P.2d 1144, 1149 (Idaho Ct. App. 1994). Some federal circuits have also applied *Brady* to plea cases either before or after the Supreme Court's decision in *Ruiz*. *See Campbell v. Marshall*, 769 F.2d 314, 324 (6th Cir. 1985); *White v. United States*, 858 F.2d 416, 422 (8th Cir. 1988); *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *United States v. Ohiri*, 133 F. App'x 555, 560–61 (10th Cir. 2005). Yet these decisions have not impeded ever-rising rates of pleas. In recent years, roughly 97% of federal convictions were the result of a plea. *Lafler*, 566 U.S. at 170. 94.6% of Texas cases were

No. 16-40772

resolved via plea in 2016. OFFICE OF COURT ADMIN., ANNUAL STATISTICAL REPORT OF THE TEXAS JUDICIARY: FY 2016 at Detail-10 (2016); available at http://bit.ly/2mcF9vp. In terms of the trend, recent decades have seen a 10-25% increase in the percentage of convictions obtained through pleas. *Compare Lafler*, 566 U.S. at 170 (reporting that "ninety-four percent of state convictions are the result of guilty pleas"), *with Brady v. United States*, 397 U.S. 742, 752 n.10 (1970) (estimating that between 75 and 85% of all felony convictions were pleas). The rise of the plea is seemingly inexorable and there is no reason to believe that a pre-plea *Brady* rise gets in its way.

There is one other problem with DOJ's concerns about the workability of a pre-plea *Brady* requirement. From the beginning, the *Brady* right has covered information that might be favorable to a defendant at sentencing. So as the government conceded at oral argument, a plea does not excuse its obligation to disclose any evidence in the prosecution's file that might mitigate the defendant's sentence. This means it is not a matter of whether exculpatory information is produced but when—either before the plea or after the plea but before sentencing. *See* USAM § 9-5.001(D)(3) (requiring the production of "[e]xculpatory and impeachment information that casts doubt upon proof of an aggravating factor at sentencing" when the presentence investigation begins). Because at some point in a federal prosecution "the government would have to search the files of all members of the prosecution team for potentially exculpatory material," DOJ Br. 16, there is little added burden of requiring that production at an earlier point in the case.

For all these reasons, there is little evidence suggesting that our court's following the *Brady* rule that many other jurisdictions already apply would

52

create any meaningful obstacle to plea bargaining.[8] But even if it did, query whether a system in which 97% of defendants plead guilty is already placing to great a premium on the need for speedy pleas at the expense of the truth-finding function of the courts. *See* BIBAS*, Plea Bargaining's Role in Wrongful Convictions*, at 157 (critiquing modern plea bargaining because it "put[s] efficiency ahead of accuracy").

That leaves *United States v. Ruiz*, 536 U.S. 622 (2002). It held the government is not required to disclose "impeachment information relating to any informants or other witnesses" prior to entering a plea agreement. *Id.* at 625. *Ruiz* did not present the question of exculpatory evidence because the government agreed in the plea agreement to turn over "any [known] information establishing the factual innocence of the defendant."[9] *Id.* at 625; *see also id.* at 629 ("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information."). Indeed, in conducting a due process balancing test to determine whether there was a right to pre-plea impeachment evidence, the Court explained that the agreement to give Ruiz exculpatory evidence "diminish[ed]" the risk that "in the absence of impeachment information, innocent individuals, accused of crimes, w[ould] plead guilty." *Id.* at 631. If *Brady* does not apply as a categorical matter to defendants who plead guilty, saying just that in *Ruiz* would have resulted in a much simpler and shorter opinion. That was the approach of Justice Thomas's

---

[8] A pre-plea *Brady* right might also apply on when the defendant requests discovery, which would further mitigate any costs on the system. Alvarez made that request.

[9] Notably, the federal government asked the Court to decide the broader question of whether defendants who plead have a right to exculpatory information. Brief for the United States*, United State v. Ruiz*, at I ("Questions Presented: 1. Whether before pleading guilty, a criminal defendant has a constitutional right to obtain material exculpatory information, including impeachment information, from the prosecution."). But the Court did not accept that invitation.

one-paragraph concurring opinion that no other justice joined. *See id.* at 633–34 (Thomas, J., concurring).

Instead the Court applied the balancing test. On the benefit side of that equation, it explained that impeachment evidence has value in terms of the "*fairness of a trial*" but not to whether a plea was knowing and intelligent. *Id.* at 629. Impeachment evidence is not "critical information," it further explained, as its relevance may become clear only in the context of a trial. *Id.* at 630. Until trial, for example, a defendant may not know if the government will call the witness who has the credibility problems. The less direct connection of impeachment evidence to the ultimate "guilt or innocence" question is reflected in the fact that it took nearly a decade for the Supreme Court to confirm that *Brady* included an obligation to disclose even at trial "evidence affecting [witness] credibility." *Giglio v. United States*, 405 U.S. 150, 154 (1972). Exculpatory evidence—that which goes directly to the "factual innocence of the defendant," *Ruiz*, 536 U.S. at 631, and is valuable on its face without requiring independent knowledge of the prosecutor's trial strategy—has much greater value as *Ruiz* recognizes when it observes that its disclosure meant there was not much additional benefit to be gained from also disclosing impeachment evidence before a plea. *Id.* at 631. Production of exculpatory evidence provides a greater safeguard against innocent defendants pleading guilty, both because it informs innocent defendants they have a substantial chance of showing their innocence at trial as opposed to just casting doubt on government witnesses and because prosecutors required to provide such evidence lose the incentive to push for guilty pleas to obscure weak cases. *See Huebler*, 275 P.3d at 97–98 ("While the value of impeachment information may depend on innumerable variables that primarily come into play at trial and therefore arguably make it less than critical information in entering a guilty

plea, the same cannot be said of exculpatory information, which is special not just in relation to the fairness of a trial but also in relation to whether a guilty plea is valid and accurate.").

That latter point recognizes a serious risk of requiring *Brady* disclosures only when a case is tried: it incentivizes prosecutors to offer favorable pleas in cases with exculpatory evidence. That is already the type of case in which a prosecutor's desire for a plea agreement is strongest. Bibas, *Plea Bargaining in the Shadow of Trial*, *supra*, at 2473 (explaining that self-interest leads prosecutors to "make irresistible offers in weak cases"). Without a *Brady* requirement, there is an additional benefit from pleading out a weak case: the plea prevents the defendant from being able to undo the conviction if he later discovers that the government possessed exculpatory evidence. *Sanchez*, 50 F.3d at 1435 ("[I]f a defendant may not raise a *Brady* claim after a guilty plea, prosecutors may be tempted to deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas."); *see also United States v. Fisher*, 711 F.3d 460, 469 (4th Cir. 2013); *United States v. Nelson,* 979 F. Supp. 2d 123, 130 (D.D.C. 2013). This is on top of the interest prosecutors already have to resolve their weakest cases with a plea agreement.

The cost side of the *Ruiz* balancing inquiry is also less favorable to the government when it comes to exculpatory evidence. The primary problem the Court saw with pre-plea disclosure of *Giglio* evidence was requiring the government to identify the witnesses it would call at a trial that would never happen because of the plea. This interfered with the rules governing disclosure of witnesses, posed risks of revealing the identities of informants and undercover agents, and eliminated some of the time savings that pleas typically bring by avoiding trial prep. *Ruiz*, 536 at 631–32. Indeed, prosecutors often do not even learn about credibility problems with

witnesses—by running criminal background checks for example—until they have come up with their witness list.  In contrast, prosecutors generally are aware of any evidence they possess that suggests a defendant's innocence by the time they enter into plea negotiations if not earlier when they bring charges.

The final proof that *Ruiz* did not decide the question of pre-plea disclosure of exculpatory evidence—and that the result might be different for this category—are the cases that have come after it.  Soon after *Ruiz*, the Seventh Circuit predicted that "it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors or other relevant government actors have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters into a guilty plea." *McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003).  It recognized that "*Ruiz* indicates a significant distinction between impeachment information and exculpatory evidence of actual innocence," though the Seventh Circuit did not ultimately decide the question because there was insufficient evidence that the government suppressed the evidence in that case.  *Id*. at 787.  The Tenth Circuit, again noting a critical distinction between exculpatory evidence and the impeachment evidence in *Ruiz*, did decide the question in favor of a right of pleading defendants to exculpatory evidence.  *See United States v. Ohiri,* 133 F. App'x 555, 562 (10th Cir. 2005).  So have a number of federal district courts.  *Nelson,* 979 F. Supp. 2d at 130 ("[I]n light of the balance of circuit court precedent and the purpose of *Brady,* Nelson can assert his *Brady* claim to argue that his guilty plea was not knowing and voluntary"); *United States v. Danzi,* 726 F. Supp. 2d 120, 128 (D. Conn. 2010) (declining "the Government's invitation to hold that *Ruiz* applies to exculpatory as well as impeachment material"); *Ollins v. O'Brien,* 2005 WL

No. 16-40772

730987, *11 (N.D. Ill. 2005) ("[T]he Court finds the *Ruiz* distinction . . . persuasive and holds that due process requires the disclosure of information of factual innocence during the plea bargaining process."). To be sure, other courts of appeals, while recognizing that *Ruiz* did not decide the question, have read it as casting doubt on the existence of a pre-plea right even to exculpatory evidence though none has done as we have and actually rejected that right. *Friedman v. Rehal*, 618 F.3d 142, 154 (2d Cir. 2010) (explaining that "*Ruiz* did not expressly abrogate [its prior caselaw] as applied to all *Brady* material" but noting it creates uncertainty about whether exculpatory material needed to be produced pre-plea); *United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010), *as amended* (Feb. 9, 2010)[10]; *cf. United States v. Mathur*, 624 F.3d 498, 507 (1st Cir. 2010) (emphasizing *Brady* is a trial right and observing "[t]he *Ruiz* Court evinced a reluctance to extend a *Brady*-like right to the realm of pretrial plea negotiations" in a case when a defendant went to trial but argued that if he had been provided exculpatory material before trial he would have pleaded guilty).

And we should not make the common mistake of treating federal decisions as the universe of caselaw on this issue. Our state court peers also interpret the federal Constitution. Four state supreme courts have held since *Ruiz* that the federal *Brady* right applies to exculpatory evidence at the plea phase, and the Texas Court of Criminal Appeals has reaffirmed its long ago adoption of that view. *Buffey*, 782 S.E.2d at 216 ("[T]he better-reasoned authority supports the conclusion that a defendant is constitutionally entitled

---

[10] In a more recent decision the Fourth Circuit allowed a defendant to vacate a guilty plea when he later learned that law enforcement had lied in applying for a search warrant that led to evidence of guilt. *Fisher*, 711 F.3d at 460. It did so not on *Brady* grounds, but on the ground that the suppression of that information made the plea unknowing. *Id.* at 471.

to exculpatory evidence during the plea negotiation stage."); *Hyman*, 723 S.E.2d at 380 (noting that an applicant can challenge the "voluntary nature of a guilty plea" by asserting a *Brady* violation); *Huebler*, 275 P.3d at 96–97 (concluding that "the due-process calculus also weighs in favor of the added safeguard of requiring the State to disclose material exculpatory information before the defendant enters a guilty plea"); *Medel,* 184 P.3d at 1235 (providing the requirements for a guilty plea to be rendered involuntary based on a *Brady* violation); *Johnson*, 2009 WL 1396807, at \*1; (vacating a guilty plea because of a *Brady* violation); *id.* at \*1–\*2 (Cochran, J. concurring) (explaining that "*Ruiz,* by its terms, applies only to material *impeachment* evidence"); *see also State v. Kenner*, 900 So. 2d 948, 952–53 (La. App. 4 Cir. 2005), *reversed on other grounds*, 917 So. 2d 1081 (La. 2005).  No state high court has ruled the other way.  *See* WAYNE LAFAVE, ET AL. 5 CRIM. PROC. § 21.3(c) (4th ed. 2015) (noting that "certainly the better view" is of those courts that require *Brady* disclosure of exculpatory evidence to defendants who plead).

The facts from one of those state court cases highlights the stakes of this issue and the dynamics that can lead an innocent person to plead guilty. Joseph Buffey was 19 when he was arrested for three breaking-and-entering offenses of businesses.  *Buffey*, 782 S.E.2d at 207.  The week before his arrest, an intruder had robbed and brutally raped an 83-year-old woman in the same town.  *Id.* at 206.  During an interrogation that lasted nine hours, Buffey at first repeatedly denied that he committed the robbery and sexual assault.  *Id.* at 207.  Hours into the questioning, and past 3:00 in the morning, he told the officers he had broken into "[t]his old lady's house" but said he could not recall any assault.  *Id.*  When the officers later told him he should be able to recall more details, Buffey recanted saying "You really want to know the truth? . . . I didn't do it."  *Id.*  He explained that he had only confessed to breaking into the

house because an officer was "breathing down my neck" and "I couldn't tell you what went on in there." *Id.*

After Buffey was charged with the rape, the state forensic lab tested DNA from the victim's rape kit. *Id.* at 208. It issued a report stating that "assuming there are only two contributors (including [Mrs. L]), Joseph Buffey is excluded as the donor of the seminal fluid identified [from the rape kit] cuttings." *Id.* (brackets in original). Although Buffey's counsel had filed a motion for production of all materials related to the assault, the prosecutor never disclosed the forensic report. *Id.*

Having made at least a partial confession to the crimes, Buffey accepted a time-limited offer to plea to the robbery and sexual assault counts in exchange for the state dropping the three charges for burglary of a business. *Id.* at 209. The court accepted Buffey's plea six weeks after the lab determined that the DNA was not his. *Id.* at 208–09. The court sentenced Buffey to a total term of 70-100 years in prison. *Id.* at 209.

After Buffey had spent eight years in prison, a court granted his request for DNA testing in a habeas motion. *Id.* at 210. The results exonerated Buffey, and he also learned that the government knew of similar results in 2002 before the court accepted his plea. *Id.* Because the state supreme court acknowledged a right to exculpatory evidence even for defendants who pleaded guilty, Buffey did not have to spend the rest of his life in prison. *Id.* at 221. And a DNA match was finally made to the person who had committed the rape, someone with a history of sexual violence living a few blocks from the victim who was not arrested in 2002 because Buffey had been wrongfully convicted. *Id.* at 210.

This "double injustice"—because it resulted in "convicting the innocent and freeing the guilty," Amicus Br. for National Association of Criminal Defense Lawyers 13—is not an isolated event. An amicus brief from a group

of former federal and state prosecutors notes that the National Registry of Exonerations has identified 73 Americans who pleaded guilty to murder or manslaughter but were later exonerated. *See* NATIONAL REGISTRY OF EXONERATIONS, available at www.law.umich.edu/special/exoneration/Pages/ detaillist.aspx (searching for "P," pleas, and those offenses lists 54 exonerations for defendants who pleaded guilty to murder and 19 for manslaughter). And more than 10% of the 353 Americans whom the Innocence Project has helped exonerate through DNA evidence pleaded guilty. THE INNOCENCE PROJECT, *DNA Exonerations in the United States*, available at www.innocenceproject.org/dna-exonerations-in-the-united-states (noting that 40 of 358 exonerees pled guilty). Scholars believe false guilty pleas are even more common for less serious offenses when the cost-benefit analysis makes a plea that results in a minor sentence enticing. John H. Blume & Rebecca K. Helm, *The Unexonerated: Factually Innocent Defendants Who Plead Guilty*, 100 CORNELL L. REV. 157, 173 (2014); *see also* Bibas, *Plea Bargaining Outside the Shadow of Trial, supra*, at 2495 (explaining that "[p]rosecutorial bluffing is likely to work particularly well against innocent defendants, who are on average more risk averse than guilty defendants"); Samuel R. Gross & Barbara O'Brien, *Frequency and Predictors of False Conviction: Why We Know So Little and New Data on Capital Cases*, 5 J. EMPIRICAL LEGAL STUD. 927, 930 (2008) ("[I]t is entirely possible that most wrongful convictions . . . are based on negotiated guilty pleas to comparatively light charges."). Alvarez is an example. He elected to plead guilty and accept a suspended sentence of eight years with ten years probation rather than risk a trial where he faced mandatory prison time if convicted. Of course, because he violated the terms of probation he ended up going to prison, only to be saved from serving a full sentence when the video was discovered.

No. 16-40772

Judicial opinions often extol liberty.  As well they should when applying a Constitution that begins with a promise to "secure the Blessings of Liberty to ourselves and our Posterity" and prohibits both federal and state governments from depriving a person of that liberty without due process of law.  U.S. CONST. Preamble, amends. V, XIV.  It is difficult to think of greater deprivations of that liberty than the government's allowing someone to be held in prison without telling him that there is evidence that might exonerate him.  That tragic situation offends the "twofold aim" of our justice system, "which is that guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88 (1935).  Due process requires more than we afford the accused today.