*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 15, 2025
1:59 PM

Plaintiff-Appellee,

v

No. 367949
Wayne Circuit Court
LC No. 21-007947-01-FH

MARCUS TERMAINE WALLACE,

Defendant-Appellant.

Before: CAMERON, P.J., and REDFORD and GARRETT, JJ.

PER CURIAM.

Defendant, Marcus Termaine Wallace, appeals as of right his jury-trial convictions of felon in possession of a firearm (felon-in-possession), MCL 750.224f; carrying a concealed weapon (CCW), MCL 750.227; and carrying a firearm during the commission of a felony (felony-firearm), second-offense, MCL 750.227b(1).[1] Defendant was sentenced as a second-offense habitual offender, MCL 769.10, to five years' imprisonment for his felony-firearm conviction, and fined $50 each for his felon-in-possession and CCW convictions. On appeal, defendant argues (1) the trial court erred by denying his motion for a new trial on the basis of an alleged *Brady* violation;[2] (2) trial counsel rendered ineffective assistance of counsel in relation to the alleged *Brady* violation and in relation to his failure to move to suppress evidence of the seized firearm on Second Amendment grounds; and (3) the trial court erred by denying defendant's motion to suppress evidence of the seized firearm on Fourth Amendment grounds. We disagree with defendant's arguments and affirm his convictions.

## I. BASIC FACTS

This case arises out of defendant's employment as a security guard for Blue Line Protection ("Blue Line"), a private security company providing both armed and unarmed security services for

---

[1] The jury acquitted defendant of felon in possession of ammunition, MCL 750.224f(6), and the corresponding felony-firearm count.

[2] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

events. Defendant began working as an unarmed guard for Blue Line in March 2020 during the coronavirus ("COVID-19") pandemic. On June 19, 2020, Blue Line was hired to provide security services for a Juneteenth celebration at Maheras Park.

During the Juneteenth celebration, Officer Erika Pryde of the Detroit Police Department was on patrol checking local parks. Upon approaching Maheras Park, Officer Pryde saw several security guards from Blue Line at the front gate, all wearing matching red and black shirts and armed with firearms on their sides. Defendant was not in this group, but inside the park taking patrons' temperatures in accordance with COVID-19 protocols. Officer Pryde asked the group of security guards if they had concealed pistol licenses ("CPLs"). Each answered that they did. Because a city ordinance prohibited carrying firearms in the park, Officer Pryde asked the security guards to remove their guns from the park. At some point, Officer Pryde was told that all of the security guards in the park were carrying firearms. She and her partner proceeded into the park.

Inside the park, Officer Pryde saw defendant wearing the same black and red shirt. Unlike the other security guards, defendant was not open-carrying a firearm. Officer Pryde noticed a bulge under his shirt. Because Officer Pryde believed the bulge to be a firearm, she approached defendant and asked him if he possessed a CPL. Defendant stated he did, but after Officer Pryde asked for his CPL and identification, defendant explained he took a class and had a certificate. Officer Pryde patted defendant down and found a loaded .38 revolver secured in an "elastic belly band" against defendant's front and side under his shirt. Defendant was arrested and taken into custody for carrying a concealed weapon without a license. After arresting defendant, Officer Pryde's partner conducted a search of defendant's name in LEIN, which showed that he was previously convicted of a felony and did not have a CPL.

Officer Pryde was wearing a body camera during her interaction with defendant. At trial, the body camera footage depicting their interaction was admitted as evidence and played for the jury. The firearm Officer Pryde confiscated during the pat-down was also admitted into evidence. Additionally, the parties stipulated that defendant had previously been convicted of a felony.

Marcus Conrad, the manager of Blue Line, testified that defendant did not have a gun when he arrived at the park. Because Blue Line was hired to provide armed security at the event, Conrad told defendant to carry a firearm during the event. Conrad took a firearm out of his own bag and placed it into defendant's belly band.

Defendant corroborated Conrad's testimony that Conrad placed the firearm in his belly band at the event. When Conrad placed the firearm on defendant, defendant told Conrad he was nervous about carrying the firearm, but Conrad told him not to worry about it. Defendant did not dispute that he knew Conrad placed a firearm on him, but he denied that he saw it or that he personally touched it.

Defendant confirmed that he knew at the time of the event he was a felon and could not possess a firearm. He did not own a firearm and did not bring one to the event. However, when he started working for Blue Line, he was encouraged to obtain a CPL. Before the event, defendant had completed a CPL course and received a certificate. He had also begun filing paperwork to expunge his felony. However, at the time of the event, defendant had not obtained a CPL.

Defendant was convicted and sentenced as previously described. After his trial, the prosecution informed defendant's trial counsel that the firearm retrieved from defendant's person was swabbed for DNA evidence but was never sent for testing. Defendant moved for a new trial, arguing that the prosecution committed a *Brady* violation when it failed to turn over exculpatory evidence establishing that defendant never "actually possessed" the gun and that trial counsel provided ineffective assistance of counsel. The trial court denied this motion. This appeal followed.

## II. *BRADY* VIOLATION

Defendant first argues that the trial court erred by denying his motion for a new trial on the basis of an alleged *Brady* violation. We disagree.

We review for an abuse of discretion a trial court's decision on a motion for new trial and review for clear error its findings of facts supporting its decision. *People v Rogers*, 335 Mich App 172, 191; 966 NW2d 181 (2020). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. "A finding is clearly erroneous if this Court is left with the definite and firm conviction that a mistake has been made." *People v Allen*, 295 Mich App 277, 281; 813 NW2d 806 (2011). We review de novo issues of constitutional law such as whether the prosecution committed a *Brady* violation. *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016).

Our Supreme Court has recognized and reiterated what the Supreme Court of the United States held in *Brady*, that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014) (quotation marks and citation omitted). Therefore, criminal defendants "have a due process right to obtain evidence in the possession of the prosecutor if it is favorable to the accused and material to guilt or punishment." *People v Stanaway*, 446 Mich 643, 666; 521 NW2d 557 (1994). To establish a *Brady* violation, a defendant must prove three elements: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *Chenault*, 495 Mich at 155. "As the appellant in this case, defendant bears the burden of providing this Court with a record to verify the factual basis of any argument upon which reversal [might be] predicated." *People v Everett*, 318 Mich App 511, 523; 899 NW2d 94 (2017) (quotation marks and citation omitted; alteration in original).

Defendant identifies the exculpatory evidence as DNA swabs that were taken from the firearm found on his person. The DNA swabs were taken before trial, but were never sent for testing. After defendant's trial, the prosecution informed defendant of the existence of the DNA swabs. Defendant moved for a new trial on the basis that the prosecution committed a *Brady* violation when it failed to disclose the existence of the DNA swabs before trial. Defendant argued the DNA swabs were exculpatory because, if they tested negative for the presence of his DNA, they supported his defense theory that defendant never "actually possessed" the gun. Defendant also argued that knowing about the existence of the DNA swabs before trial would have impacted the outcome of the parties' plea negotiations.

The trial court denied defendant's motion for a new trial. It concluded that, assuming for the sake of argument that the prosecution suppressed the DNA swabs, disclosure of the existence of the DNA swabs would not have likely changed the result of the trial or the plea negotiations. Regarding the outcome of the trial, the trial court explained that the prosecution presented overwhelming evidence of defendant's guilt at trial, including the video evidence of a police officer removing a weapon from underneath defendant's shirt, Conrad's testimony that he placed a gun on defendant, and defendant's testimony acknowledging that he was aware Conrad placed the gun on him. The trial court also noted that if the DNA evidence came back positive for defendant's DNA, it would have harmed defendant's theory of the case. However, if the DNA evidence came back negative for defendant's DNA, this would comport with the evidence presented at trial that Conrad placed the gun on defendant. Regarding plea negotiations, the trial court explained it was unaware of any effect the DNA swabs would have had on plea negotiations. As the court that presided over the pretrial proceedings, the trial court recalled that the prosecution's position on plea negotiations was only to offer a five-year sentence for felony-firearm.

The trial court did not abuse its discretion when it denied defendant's motion for a new trial because defendant failed to establish all three elements of a *Brady* violation. First, the prosecution was not suppressing evidence. While DNA swabs of the firearm were taken, those DNA swabs were never sent for testing. Accordingly, no definitive evidence yet existed as to whether defendant's DNA was on the firearm. While a prosecutor has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case," due process "does not generally require the prosecution to 'seek and find exculpatory evidence' or to search for evidence that will support a defendant's case." *Dimambro*, 318 Mich App at 213 (citations omitted). The prosecution cannot be faulted for failing to turn over potentially exculpatory evidence not yet in existence. Defendant argues if he was aware the DNA swabs existed, he would have requested testing by the prosecution or arranged for testing on his own. While defendant was unaware DNA swabs of the gun were taken, defendant was aware the firearm was in evidence. If DNA testing on the gun would have provided exculpatory evidence as defendant asserts, defendant could have requested to test the firearm himself. See MCR 6.201(A)(6) (providing for mandatory disclosure upon request of "a description of and an opportunity to inspect any tangible physical evidence that the party may introduce at trial").

Second, defendant did not establish that the DNA swabs would have been favorable to his defense. "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Chenault*, 495 Mich at 150. The existence of the DNA swabs alone are not favorable to defendant. There is no allegation that the existence of the DNA swabs would result in impeachment evidence. Likewise, defendant did not argue why the existence of the DNA swabs themselves constituted exculpatory evidence.

Instead, defendant's argument on this issue relies solely on his speculation that testing of the DNA swabs would have excluded the presence of defendant's DNA on the firearm, resulting in exculpatory evidence. However, as explained by the trial court, it is unknown what result testing of the DNA swabs would provide. If testing of the DNA swabs resulted in a positive match for defendant's DNA, this would harm defendant's trial strategy because it would be additional circumstantial evidence that the firearm was in his possession. However, if testing of the DNA swabs excluded defendant's DNA from the firearm, this evidence would not be exculpatory. At

trial, defendant and Conrad testified that defendant did not touch the firearm before Conrad placed it on defendant's person. Consequently, the possible DNA evidence would, at best comport with the evidence presented by both sides at trial and at worst, contradict defendant's testimony in a way unfavorable to him.

Defendant argues that the DNA evidence would be favorable to his defense because it would support his defense theory that he did not "actually possess" the gun. This argument is premised on his legal theory that if the firearm was placed on him without him handling the firearm, it was impossible for him to possess the weapon in order to be guilty of the firearm offenses. This argument ignores that possession "can be actual or constructive, joint or exclusive." *People v Johnson*, 293 Mich App 79, 83; 808 NW2d 815 (2011). A defendant "has constructive possession of a firearm if the location of the weapon is known and it is reasonably accessible to the defendant." *Id*. Defendant did not need to place the firearm on his own body to have possession of it. Its placement against his side with his knowledge and within his ability to access it established that he possessed the firearm. See *id*. Consequently, the possible existence of negative DNA results would not be exculpatory.

Third and finally, even if the DNA swabs would have excluded the presence of defendant's DNA on the firearm, this evidence would not have been material at trial or in the plea negotiations before trial. In *Chenault*, our Supreme Court explained the materiality element in *Brady*:

> To establish materiality, a defendant must show a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." [*Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995)]. The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. [*Chenault*, 495 Mich at 150-151.]

First, defendant did not establish that there is a reasonable probability the potential DNA evidence would result in a different outcome at trial. As explained by the trial court, the prosecution presented video evidence which showed a police officer recovering the firearm from underneath defendant's shirt. Additionally, Conrad testified that because the security guards were required to be armed for the event, he took the firearm and placed it on defendant's person. Defendant's own testimony corroborated Conrad's testimony that he placed the gun on defendant's person. Further, defendant acknowledged at trial that, although he never touched the gun, he knew Conrad placed it on his person. Collectively, this was overwhelming evidence that defendant possessed the gun. See *Johnson*, 293 Mich App at 83. Had defendant presented evidence that his DNA was excluded from the firearm, there is no reasonable probability of a different outcome at trial.

Second, defendant did not establish that there is a reasonable probability the potential DNA evidence would have impacted the plea negotiations. Defendant erroneously asserts that the trial court abused its discretion by concluding *Brady* only pertains to trials. Neither party has identified authority holding that *Brady* applies to plea negotiations. Likewise, this Court is unaware of any binding authority that extends *Brady* to plea negotiations.[3] Regardless, contrary to defendant's assertion, the trial court stated it was unaware of any caselaw regarding *Brady* violations in that context, but did not find they could not occur. The trial court continued on to conclude that defendant offered no explanation how the hypothetical DNA evidence would have resulted in a different plea offer.

Even if we assume *Brady* extends to plea negotiations, as explained by the trial court, the record evidence indicates that the prosecution consistently offered a five-year sentence for felony-firearm before trial, with the trial court even noting its disagreement with that offer. Throughout the pretrial proceedings, the prosecution was aware of the evidence supporting defendant's possession of the firearm, including the video showing a police officer recovering the firearm from defendant's person. Defendant has not shown the hypothetical DNA evidence excluding his DNA from the firearm would have given defendant leverage to negotiate a better plea deal or otherwise have impacted the plea negotiations. For these reasons, defendant has not established a *Brady* violation. Accordingly, the trial court did not abuse its discretion when it denied defendant's motion for a new trial.

## III. INEFFECTIVE ASSISTANCE

Defendant raises two claims of ineffective assistance of counsel. First, he argues trial counsel rendered ineffective assistance connected with the alleged *Brady* violation. Second, defendant argues trial counsel was ineffective for failing to move to suppress the firearm on Second Amendment grounds. We disagree as to both.

Generally, whether a defendant had the effective assistance of counsel is a mixed question of fact and law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). However, if the trial court did not hold an evidentiary hearing on this issue, then there are no factual findings to which we must defer. *People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589 (2012), vacated not in relevant part, 493 Mich 864 (2012). When, as here, an evidentiary hearing

---

[3] In *United States v Ruiz*, 536 US 622, 633; 122 S Ct 2450; 153 L Ed 2d 586 (2002), the United States Supreme Court held that the federal "Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." The Court did not explicitly determine the prosecution's duty regarding pre-plea disclosure of exculpatory evidence. Since *Ruiz*, the United States Supreme Court has not revisited the question; however, a circuit split exists among the United States Court of Appeals regarding the prosecution's duty to disclose exculpatory evidence in plea negotiations. Compare *United States v Overton*, 24 F4th 870, 878 (CA 2, 2022) (explaining a district court lacked discretion to deny a motion to withdraw a guilty plea where a *Brady* violation was established), with *Alvarez v City of Brownsville*, 904 F3d 382, 394 (CA 5, 2018) (declining to hold that a constitutional violation occurs when *Brady* material evidence is not shared during plea negotiations). We decline to offer any opinion on the matter.

on the ineffective-assistance claims was not held, our review is limited to errors apparent on the record. *Id*. We review de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant. *Id*. at 19-20.

To obtain a new trial on the basis of ineffective assistance of counsel, a party must establish that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome [of trial] would have been different." *People v Trakhtenberg*, 493 Mich 38, 51-52; 826 NW2d 136 (2012). See also *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks and citation omitted). "[D]efendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Further, the effective assistance of counsel is presumed, and defendant must overcome a strong presumption that trial counsel's performance was born from a sound trial strategy. *People Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019). Trial counsel may be ineffective for failing to adequately investigate and prepare for trial. *Ackley*, 497 Mich at 389.

As already noted, no evidentiary hearing on defendant's ineffective-assistance claims was held in this case. However, the trial court addressed defendant's ineffective-assistance claim in relation to the *Brady* violation at the hearing on defendant's motion for a new trial. The trial court concluded that trial counsel did not provide ineffective assistance of counsel. The trial court did not address the first prong of *Strickland*, but concluded that had trial counsel had access to the results of the DNA swabs at trial, there was no reasonable probability of a different result at trial.

On appeal, defendant's claim of ineffective assistance related to the *Brady* violation is difficult to parse. Contrarily, defendant argues trial counsel did everything he could to present a defense and "none of this is [trial counsel's] fault," but also argues trial counsel rendered ineffective assistance because of the information not known to him at the time of trial. Regardless, we conclude this claim is without merit.

To the extent defendant argues trial counsel "did everything [he] could" with the information available at trial, defendant has not asserted a claim for ineffective assistance of counsel. To the extent we understand defendant's argument to be that trial counsel failed to adequately investigate or prepare for trial, defendant has not established the factual predicate for his claim. Defendant's argument assumes without providing factual support that DNA testing could have resulted in exculpatory evidence. See *Carbin*, 463 Mich at 600.

Even if defendant could establish the first *Strickland* prong, defendant cannot establish any prejudice related to his ineffective-assistance claim. A *Brady* claim is assessed under the same "reasonable probability" standard applicable to assess prejudice under *Strickland*. *Chenault*, 495 Mich at 159. As previously discussed, the prosecution presented overwhelming evidence that defendant possessed the firearm, including the body camera footage showing the firearm on his person and defendant's own testimony conceding that he knew the firearm was placed on his person. Given this evidence, even if testing of the DNA swabs excluded defendant's DNA from the firearm, there was not a reasonable probability that the evidence would result in a different

outcome at trial. Because defendant cannot establish that the DNA swabs were material, he also cannot establish prejudice arising from trial counsel's alleged failure to investigate the DNA swabs. See *id*. Accordingly, defendant's claim of ineffective assistance premised on the alleged *Brady* violation is without merit.

In defendant's second claim of ineffective assistance of counsel, defendant argues trial counsel was ineffective for failing to move to suppress the firearm on Second Amendment grounds. Specifically, defendant argues trial counsel should have challenged the constitutionality of the felon-in-possession statute in light of the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc, v Bruen*, 597 US 1; 142 S Ct 2111; 213 L Ed 2d 387 (2022), and that without the gun any charges stemming from its possession would have collapsed and resulted in dismissal of the case. This claim is without merit.

We see no need to address the merit of defendant's arguments regarding the constitutionality of MCL750.224f in light of *Bruen*. Even if trial counsel had moved to suppress the firearm under the Second Amendment on the basis that MCL 750.224f was unconstitutional, such a motion would be futile. See *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998) ("[T]rial counsel cannot be faulted for failing to raise an objection or motion that would have been futile."). Defendant was also charged with CCW, MCL 750.227; and felony-firearm, MCL 750.227b. Defendant does not argue trial counsel was ineffective for failing to challenge the constitutionality of either of these statutes. The CCW statute is not predicated on an individual being a felon, it bars carrying a concealed weapon for anybody who does not possess a valid CPL. Defendant argues but for his prior felony conviction, he would have been able to obtain a valid CPL, and would not face additional criminal penalties, however, this argument is purely speculative. As such, defendant has not shown the outcome of the suppression hearing would have been different because the gun would not have been suppressed on these grounds, and would still have been used as evidence in defendant's CCW trial. Trial counsel was not ineffective for failing to make a futile motion.

## IV. MOTION TO SUPPRESS

Finally, defendant argues the trial court erred by denying his motion to suppress the firearm evidence on the basis that the firearm was obtained in violation of defendant's Fourth Amendment right to be secure against unreasonable searches and seizures. We disagree.

We review a trial court's findings of fact at a suppression hearing for clear error. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). We review "de novo questions of constitutional law and a trial court's decision on a motion to suppress evidence." *People v Brcic*, 342 Mich App 271, 277; 994 NW2d 812 (2022).

The Constitutions of the United States and Michigan both guarantee the right of persons to be secure against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. "Searches and seizures conducted without a warrant are unreasonable per se, subject to several specifically established and well-delineated exceptions." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996). Generally, if evidence is seized in violation of the Fourth Amendment, it is inadmissible at trial. *People v Mahdi*, 317 Mich App 446, 458; 894 NW2d 732 (2016).

One of the established exceptions to the warrant requirement is a *Terry*[4] stop. *People v Williams*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365299); slip op at 4. Under *Terry*,

> if a police officer has a reasonable, articulable suspicion to believe a person has committed or is committing a crime given the totality of the circumstances, the officer may briefly stop that person for further investigation. Moreover, under *Terry*, a police officer may approach and temporarily detain a person for the purpose of investigating possible criminal behavior even if probable cause does not exist to arrest the person. [*People v Wheeler*, 336 Mich App 361, 365; 970 NW2d 438 (2021) (quotation marks and citation omitted).]

"Reasonable suspicion entails something more than an inchoate or unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *Champion*, 452 Mich at 98, citing *United States v Sokolow*, 490 US 1; 109 S Ct 1581; 104 L Ed 2d 1 (1989). Further, police officers may make inferences based on their experience and training, and this Court should defer to his or her experience. *People v Steele*, 292 Mich App 308, 314-315; 806 NW2d 753 (2011). Likewise, "[p]olice officers are permitted to approach a person in a public place and ask questions without violating the Fourth Amendment." *Wheeler*, 336 Mich App at 368.

Under the totality of the circumstances, a reasonable suspicion existed to stop defendant for a limited search. The crime of CCW prohibits a person from carrying a concealed weapon without a CPL. *Williams*, ___ Mich App at ___; slip op at 4; MCL 750.227(2). At the hearing on defendant's motion to suppress, Officer Pryde testified about arresting defendant. She testified that, upon arriving at the park, she saw a group of men wearing the same shirt all openly carrying guns at their side. After speaking with the group, she learned they were security hired for the event at the park and that they were all armed. Officer Pryde entered the park and saw defendant, who was wearing the same shirt as the other security guards but did not have a gun holstered on his side. Officer Pryde testified when she approached defendant, she noticed a bulge at his midsection, which she believed to be a firearm based on her six and a half years as a police officer. It is reasonable for Officer Pryde to infer if every security guard was armed, defendant, wearing the same shirt, was also armed, and because defendant was not openly carrying, the bulge Officer Pryde observed was likely to be a concealed firearm.

After approaching defendant, Officer Pryde asked if he had a valid CPL, to which defendant asserted he did, but defendant could not produce one and admitted he only had a certificate for completing a CPL course. See *Wheeler*, 336 Mich App at 368. Defendant was then handcuffed and a gun was recovered from the belly band on his midsection. Considering the record, Officer Pryde had a reasonable, articulable suspicion defendant was carrying a concealed handgun without a CPL, and was justified in conducting an investigatory stop, which resulted in the discovery of the firearm.

Defendant asserts Officer Pryde's asking defendant "where is it," in the body camera footage supports his argument she did not actually see a bulge, and her claim she saw a bulge on

---

[4] *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

his midsection, from thirty feet away, while he was wearing a loose-fitting black shirt, "defies reality". Defendant's argument is essentially Officer Pryde is not a credible witness. A trial court's credibility determination is a factual finding entitled to deference. See *People v Galloway*, 259 Mich App 634, 638; 675 NW2d 883 (2003). Officer Pryde explained at the suppression hearing that she asked defendant where the gun was when she started searching him because it "wasn't exactly where the bulge was." Moreover, the fact that one could not tell from the body camera footage if the bulge was visible on defendant did not necessitate the conclusion that Officer Pryde could not possibly see a bulge on defendant's midsection. Officer Pryde was the only individual who testified at the evidentiary hearing, and the trial court's reliance on her testimony in concluding a reasonable suspicion existed indicates the trial court found her testimony credible. Giving deference to the trial court's factual determinations, we are not left with a definite and firm conviction the trial court erred in relying on Officer Pryde's testimony. See *Williams*, 472 Mich at 313.

Affirmed.


/s/ Thomas C. Cameron
/s/ James Robert Redford
/s/ Kristina Robinson Garrett